HLISTA *v.* ALTEVOGT, et al.

[No. 307, September Term, 1964.]

44

*Decided May 25, 1965.*

The cause was argued before PRESCOTT, C. J., and HORNEY, MARBURY, OPPENHEIMER and BARNES, JJ.

*Nelson R. Kerr, Jr.,* with whom were *Nelson R. Kerr* and *Kerr & Kerr* on the brief, for appellant.

*Preston A. Pairo, Jr.,* with whom was *Leonard S. Jacobson* on the brief, for appellees.

PRESCOTT, C. J., delivered the opinion of the Court.

This appeal has some unusual aspects and reaches us in a peculiar posture. The plaintiff-appellant sought below to recover certain real property which he had deeded some years before (no question of laches is raised) to his niece and nephew, who were the children of his sister, one Albina Altevogt. In this deed, the appellant reserved unto himself a life interest, without power of disposition.

The facts were not developed on several important issues and a very large portion of the record extract is consumed by colloquy between the court and counsel and the court and witnesses. The chancellor concluded that plaintiff's testimony disclosed that he did not come into equity with "clean hands"; hence he left the parties as he found them, without the defendants offering any proof, and without the chancellor making other findings of facts. From an order dismissing his bill and ordering him to pay the costs, plaintiff appealed.

Several questions are presented and argued in appellant's brief, but, if we answer all of them, it will necessitate, because of the incomplete state of the proof, our answering what amount to hypothetical questions. We shall, therefore, confine ourselves, on this appeal, to a holding that the evidence, as adduced up to the time of the chancellor's order, did not justify an applica-

tion of the doctrine of unclean hands against the appellant, and a ruling on the admissibility of certain testimony; and we shall remand, under Maryland Rule 871 a, for further proceedings.

The appellant, a 72 year old Austrian immigrant at the time of the trial below, obtained a small parcel of land (some 8.4 acres), in Baltimore County, from his parents in 1942.[1] The parents, apparently, reserved the right to live in three rooms in the dwelling located thereon. In 1942, the house burned down. Not very long thereafter, the appellant obtained a small adjoining parcel of land, and built his father and mother a house on this newly acquired parcel "right there near the branch where the water would be and where we can get electric * * *."

In 1943, Oscar Ruf, who had married appellant's sister, Anna, arrived in Baltimore County from his former residence in California, and moved into the house occupied by appellant's parents. From this time on, appellant had trouble: his pigs (of which he had some 200 to 300 and which comprised his livelihood) were poisoned; his cattle were shot; his right of way was obstructed; and he was haled into Magistrates' Courts on a number of occasions. Appellant attributed all of his difficulties to Oscar Ruf, and claimed that by "undue influence" exercised by Ruf upon his parents, appellant was threatened by law suits and disputes over his right to use a roadway.

During this time of harassment, one of his sisters, Albina Altevogt, kept importuning appellant to deed the property to her two children, who, together with their respective spouses, are the appellees herein.[2] Appellant makes no claim that either the niece or the nephew made any misrepresentations to him in order to obtain the deed; his negotiations relative thereto were with their mother. According to appellant, this sister represented to him that he would lose the property as the result of being sued by Ruf, who had threatened to sue him, but if he

---

1. Our statement of facts may be subject to minor inaccuracies, due to the unfortunate state of the record.

2. No contention is made that either the niece or the nephew exerted any effort to have the property conveyed to them, but the wife of the nephew, who worked for a prominent lawyer, instructed the lawyer concerning the preparation of the deed, and took the appellant to her employer's office to execute it.

would "sign it over to her children," he would get it back after the suit. Finally in 1945, at a time when he was sick in mind and body (he was suffering from a protracted illness) and scared ("I lost my house; I lost my cattle, it was shot and I had been promised to take the piece of land away so I just went and signed it over."), he signed the deed, without consideration, to his niece and nephew, because he trusted them and their mother. He did not know "much" about the "effects" of a deed, but he trusted them, and his sister had assured him that he "would get it [the property] back."

No attempt was made to show that Ruf ever had a just claim against appellant, and Ruf died without instituting any proceeding against him. And no attempt was made to show that appellant rendered himself "judgment proof" by his transfer to his niece and nephew. On the contrary, the testimony showed that he had personal property of considerable worth, and he always had cash on hand, as evidenced by his subsequent loans to his niece and nephew. In 1946, at Ruf's instigation (according to appellant), appellant's parents filed suit against him and the appellees herein as his assignees. As a result of this suit, appellant was directed by the court to erect another residence on the subject property "on [the] original site [of the burned residence] or site agreeable to complainants * * *," or the deed from his mother and father to him would be rescinded. With this order, the appellant fully complied, without any contribution from the appellees. Appellant testified that thereafter the appellees, on many occasions, promised to execute a deed releasing their interests in the property to him, but they never would do so.

The appellees filed a short and rather incomplete answer to appellant's bill of complaint. They claimed they had "no personal knowledge" of the facts alleged in five paragraphs thereof, and "emphatically" denied the allegations of the other two. Some of the allegations contained in the latter were of such a nature that it is difficult to see how a denial thereof was proper; for examples, the allegations that appellant had deeded the property to the appellees and that appellees had "failed, neglected and refused" to reconvey the same to him. See Maryland Rule 372. In any event, the answer was sufficient to disclose that,

even though the niece and nephew had little, if anything, to do with the appellant's execution of the deed, both intended to stand firmly upon the deed as executed, and they thereby ratified and confirmed the actions and conduct of their mother and Ora Altevogt exerted in their behalf.

## CLEAN HANDS.

The Maryland decisions which have dealt with the maxim, "he who comes into equity must come with clean hands," as well as those which have considered its cognate maxims, have very generally been in conformity with the holdings in other jurisdictions and the statements of the leading text-writers upon the subject. The maxim is based upon public policy and, in a general sense, may be said to mean that courts of equity will not lend their aid to anyone seeking their active interposition, who has been guilty of fraudulent, illegal, or inequitable conduct in the matter with relation to which he seeks assistance. *Schaeffer v. Sterling*, 176 Md. 553; *Thomas v. Klemm*, 185 Md. 136; *Mas v. Coca-Cola Co.*, 163 F. 2d 505 (C.A. 4). There is, of course, no reason for applying the maxim unless the facts actually disclose unclean hands, *Stebbins-Anderson Co. v. Bolton*, 208 Md. 183, *Tawney v. Mutual System of Md.*, 186 Md. 508, and a reading of what was said above indicates, as is the fact, that equity courts, in applying the maxim, do not require litigants to have led faultless lives in their dealings on all matters, but confine themselves to the effect that the alleged fraudulent, illegal, or inequitable conduct has upon the request for relief then under consideration. *Brown v. Brown*, 199 Md. 585; *Niner v. Hanson*, 217 Md. 298.

The maxim is subject to certain limitations or qualifications, but it will not be necessary to attempt to mention all of them here. It has been stated "that if the alleged wrongful conduct of a complainant appears not to have injured the defendant, the maxim cannot be successfully invoked." *Thomas v. Klemm, supra.* See also *First National Bank v. Carter*, 132 Md. 218. However, in *Messick v. Smith*, 193 Md. 659, it was pointed out that the above statement is too broad, and the true rule is that when a plaintiff's wrongful conduct is not contrary to law or public policy, he is not barred unless it injures the defen-

dant. Also, it is generally recognized that impropriety which has been purged is not, under the maxim, fatal to plaintiff's suit. *Sherwood Co. v. Sherwood Dist. Co.,* 177 Md. 455; *Niner v. Hanson, supra.*

In the case at bar, we are unable to conclude that the record justifies a finding that appellant's conduct was fraudulent, illegal, or inequitable. The chancellor limited his finding to fraudulent and inequitable conduct on appellant's part by conveying the property, subject to a reserved life estate, to his niece and nephew "for the sole purpose of concealing or hiding his previous fee simple title to the property from one [Ruf] who may have had, although this was not shown, a valid claim against him or the property." [3] It was noted above that Ruf was not shown ever to have had any claim of any nature whatsoever against appellant, and he died without attempting to assert one, although appellant testified that Ruf "tried to sue for everything." Also, the record fails to show that appellant was pressed by any creditor or creditors of his.

Appellant is an immigrant with a limited education, who still experiences difficulty with our language. Ruf (although the record is silent on the point) seems to have been a native of this country. Appellant testified that he had "great troubles" after Ruf arrived from California. His sister, whose daughter-in-law (the wife of one of the appellees and, apparently, a native born citizen) was the secretary of a prominent attorney in Baltimore County, told him, at a time when he "was threatened to be sued by my brother-in-law," and when he was suffering from physical ailments as well as his other troubles, that

---

3. Although the chancellor limited his finding to appellant's conduct as it related to a possible claim of Ruf, the testimony refers, also, to a possible claim of appellant's parents against him. This claim, presumably, was protected by recorded deed, and could not be destroyed by appellant's deed to appellees. In any event, the claim was pressed by suit, and appellant fully complied with the court's decree rendered against him. We shall, therefore, say nothing more concerning appellant's conduct as it related to his parents' claim, other than to say that if we assume, without deciding, that it was improper in its inception as it related to them, such impropriety, under the authorities named above, was purged long before the institution of the present suit.

he would "lose the property" unless "he signed it over to her children," which he did. The record as it now stands warrants, we think, no more than a finding that appellant's actions were those of an unsophisticated man in real-property law and the business world attempting to protect his small parcel of land from an unjust and unfounded claim (the nature of which is not disclosed), which his sister represented to him could, in some manner, be successfully pressed against him, and he would lose his property. Such conduct does not call for an application of the unclean hands doctrine.

The above ruling makes it unnecessary to consider appellant's further contention that if it be conceded, *arguendo,* that his conveyance to his niece and nephew was fraudulent, he would not be barred from relief under the clean hands maxim, because (a) the creditors whose claims were meant to be affected by the conveyance were, in fact, paid, and (b) the threatened claim which occasioned the conveyance was never established. Cf. *First National Bank v. Carter, supra; Lord v. Smith,* 109 Md. 42; 1 Scott, *Trusts* (2nd Ed.) § 63, also volume 4, § 422; 1 Restatement, *Trusts 2d,* § 63, subsection (1), comment (b), also volume 2, § 422; Anno: 21 A.L.R. 2d 589, 600, 601, 602.

## THE EVIDENCE QUESTION.

Appellant proffered to prove that a witness, as a result of a conversation with Albina Altevogt, could testify that "she [the witness] knows that [Albina Altevogt] was acting on behalf of the children [in procuring the deed from appellant], two of whom are defendants in this case, and that she [the witness] knows the reasons why this deed, which is in controversy here was executed." This proffer was rejected by the chancellor.

The proffer, as it is worded and presented to us, leaves us little to rule upon. Albina is not a party to the suit. The witness' testimony, apparently, was offered upon the theory that it was an admission by the agent of the appellees, and therefore should have been received against them. The first portion of the proffer is an attempt to establish the fact of agency. We have held above that appellees' answer disclosed a ratification by appellees of Albina's actions in their behalf; consequently no harm resulted to appellant by a refusal of this part of the prof-

fer, even if it were, in fact, admissible. In addition, it is well-established law that an alleged agent's own declarations are insufficient to establish his agency, *Whittle v. Brown*, 217 Md. 161, 167, although they may become admissible to impeach his testimony, if he takes the stand. 4 *Wigmore, Evidence,* § 1078. The record extract makes no attempt to date the alleged conversation between the witness and Albina. And, even though it might be very interesting to learn this witness' version of "the reasons why this deed * * * was executed," the proffer makes no showing that these "reasons" have any bearing whatsoever upon the issues here involved. Litigation is necessarily expensive; it would, indeed, be unfortunate if a case were reversed on the assumption that a witness' testimony, offered under a broadly worded proffer such as we have here, would be to a certain effect, only to discover, when the witness testifies, that the testimony has no relevance to the issues involved. We hold that the chancellor was correct in rejecting the above proffer.

From what we have said above, it is seen that the chancellor "closed the doors" of the equity court to appellant's request for relief, holding that the unclean hands doctrine was applicable. He made no other findings of fact and stated no other conclusions of law; consequently, we shall neither affirm nor reverse, but remand the case for further proceedings, which will include the right of both sides to take additional testimony, if they so desire.

> *Judgment neither affirmed nor reversed, and case remanded for further proceedings consistent with this opinion; costs to abide the result.*