## WHITEHURST *v.* WHITEHURST

[No. 352, September Term, 1969.]

*Decided May 5, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SMITH and DIGGES, JJ.

*Richard C. Murray* and *Stanford Hoff* for appellant.

*James Willard Davis*, with whom was *William B. Dulany* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The question presented for our decision in this suit by the appellant, Dorothy P. Whitehurst, the plaintiff below (wife), in the Circuit Court for Carroll County (Weant, J.) for a divorce *a mensa et thoro* against her husband, the appellee, Robert H. Whitehurst, on the ground of desertion is whether or not the lower court was clearly in error in holding that the husband had established the defense of recrimination because of the wife's alleged unjustified refusal of marital relations with her husband.

The parties were married in Carroll County on April 19, 1952. Three children were born as a result of the marriage, *i.e.*, Patricia Ann on September 21, 1957, Deborah Jean on August 14, 1958, and Roberta Harrison on June 4, 1960. After living in South America for several years, the parties returned to Westminster, Carroll County, and have resided there since that time.

Both parties testified in regard to marital discord in recent years prior to the filing of the bill of complaint. The husband testified that the wife had left him on two occasions without his knowledge—the first occasion being in 1962 when he returned home from a trip out of the state for a week and did not find his wife at home but at the "shore" with the children; the other occasion being at an unnamed date when the wife was in Cumberland, where she apparently visited during the summers. The husband also complained that his wife was absent from the home with the children on some weekends during the last few months the parties were living together. The husband did not suggest that there was any marital infidelity on the part of the wife.

The wife, on the other hand, denied ever leaving the home without advising her husband where she was, ex-

cept for one weekend in 1968 and that the husband had asked her no questions in regard to the details of this occasion. The wife, on cross-examination, testified that her husband had been "running out on me" in 1961, had admitted to her that he was having extra-marital relations at that time, that they consulted a marriage counsellor and that "she forgave him and took him back." The husband did not contradict this testimony of the wife.

Both parties testified that the husband's "special job" for his employer in Salisbury in 1968 was a source of marital conflict. The wife testified that the five day a week assignment had "caused a lot of argument with us"; the husband stated that he "was working very hard in Salisbury and then coming home and have to face this and it kept getting worse and worse. . ."

It was during 1968 that the wife became quite suspicious of her husband's conduct. She testified that the husband refused to take her anywhere; that he came home late at night; that she found dirty handkerchiefs indicating "that he had not been alone"; that she discovered a supply of prophylactics in the basement where her husband kept them and some in his wallet—which he did not need to use in the marriage relation, the wife having had a hysterectomy—and that early in August, 1968, her husband came home at 3:00 A.M., undressed in the children's bathroom which he had never done before, and used alcohol "to clean himself." This testimony of the wife was uncontradicted.

In November 1968, the wife testified that her husband asked her for a divorce and stated that "he was doing what he wanted to do" and that "he intended to keep on doing it." The husband did not contradict this testimony by the wife; indeed, he admitted that he told his children (all girls, at that time, between the ages of 9 and 12) that he was "in love with another woman."

There is substantially no dispute in regard to the husband's departure from the marital abode. On December 26, 1968, the wife had an appointment for one of the children with a physician at 9:00 A.M. Her daughter by

a previous marriage was to drive them to the physician's office and obtained the husband's keys to move his automobile from the driveway. The husband was advised of the wife's plans and she testified that "He said nothing about his not being here when we returned." Upon their return, the husband's clothes were gone and he had left his wedding band on the wife's dressing table "on top of a garbage bill. . . .As if it was part of garbage." He also left a check for $60.00, together with a note for the children which stated in part: "Please try to understand why I must do what I have done." This testimony was corroborated by the wife's daughter by her previous marriage and was not denied by the husband.

The husband's defense of recrimination was based upon his testimony that his wife left his bedroom in the middle of the summer of 1968 and occupied a separate bedroom in the home. He stated that she had complained of his watching television at a late hour and that he had replied that ". . . if you don't like it why don't you go in the other room." It was his best recollection that their last marital relations were in the midsummer of 1968. On direct examination he testified that he had requested marital relations at "various times," but on cross-examination he admitted that his "sexual desires have been taken care of elsewhere."

The wife admitted that there had been no marital relations since July 1968; but she was not questioned in regard to whether or not any demands for relations occurred after that time. The wife testified that the husband was spending five days a week in Salisbury and spent Saturdays and some Sundays helping a neighbor, Mr. Redmer, with some work at Mr. Redmer's home. Neither Mr. Redmer nor the wife's daughter by her previous marriage could testify when the parties began to occupy separate bedrooms, the daughter not thinking, however, that this occurred during the summer.

Mr. Redmer testified that about two years prior to the trial (approximately June 1967) the wife had told him

that "she felt no warmth" although she said she was "a warm woman, but not for Mr. Whitehurst."

In the original bill of complaint the wife, as indicated, prayed for a divorce *a mensa et thoro* on the ground of desertion, and also sued, in the alternative, for a divorce *a vinculo matrimonii* on the ground of adultery. She also prayed for custody of the minor children, for alimony, support for the minor children, suit money and other relief. The lower court filed a written opinion finding that there was insufficient corroboration of adultery on the part of the husband and that although the husband had left the family home, the wife "did, in fact, refuse to have marital relations with the Defendant [the husband] without just cause." Based upon this recrimination, which the lower court concluded the husband had established, the wife's prayers for a divorce and alimony were denied in the final decree of August 27, 1969. The lower court awarded custody of the minor children to the wife, ordered the husband to pay to the wife $25.00 a week for each child and allowed an additional counsel fee for the wife's attorney. The husband was also ordered to pay all extraordinary medical and dental expenses for the children and was given reasonable visitation rights.

The wife perfected a timely appeal from the decree of August 27, 1969. She does not challenge in this Court the denial of the lower court of her prayer for a divorce *a vinculo matrimonii* on the ground of adultery, but only that portion of the decree refusing her prayer for a divorce *a mensa et thoro* on the ground of desertion, denied, as we have indicated, because of the lower court's finding that the husband had established his defense of recrimination.

We are of the opinion that the lower court was clearly in error in finding that the husband had established his defense of recrimination and in failing to grant the prayer of the wife for a divorce *a mensa et thoro* on the ground of the husband's desertion and a suitable amount of alimony.

We are mindful of the provisions of Maryland Rule

886 a which provides, in effect, that in cases tried before the court without a jury, the findings of the trial court upon the facts will not be disturbed by us unless clearly erroneous with due consideration being given to the trial court's position to observe the demeanor of the witnesses. See *Cullotta v. Cullotta,* 193 Md. 374, 66 A. 2d 919 (1949). In the present case, however, the uncontradicted evidence and, indeed, the admissions of the husband, himself, indicate to us that the wife was justified in refusing to have marital relations with her husband, even if it be assumed for the argument, that the husband had established that there had been a *permanent refusal* of marital relations. In regard to such a permanent refusal, however, it should be noted that the wife made no admissions and no corroborating evidence was offered.

There had been a separation of the parties because of the husband's extra-marital relations in 1961 (which the husband admitted), with a subsequent reconciliation. This episode was calculated to make the wife suspicious when he refused to take her anywhere and came home late at night. Her suspicions were confirmed when she discovered his dirty linen and supply of prophylactics, some of which were kept in his wallet, and particularly by the episode on August 3, 1968, when her husband undressed and cleaned himself with alcohol in the children's bathroom after coming home at 3:00 A.M.

The fact of cessation of sexual relations between husband and wife, does not, *per se,* establish constructive desertion. *Fortman v. Fortman,* 250 Md. 355, 360, 243 A. 2d 517, 520 (1968). Nor does the occupancy of separate bedrooms, *per se,* establish a marital offense constituting a ground for a divorce. *Parsons v. Parsons,* 255 Md. 602, 604, 258 A. 2d 437, 438 (1969).

In the instant case, the husband, himself, testified that the removal of the wife to another bedroom was at his instigation, as it were, when she complained about his watching television at a late hour. The husband did not deny his misconduct in 1961, his late hours, his dirty linen or his keeping of a supply of prophylactics. He ad-

mitted that during the arguments of the parties, from time to time, he had stated to the wife on more than one occasion that his sexual desires were taken care of elsewhere; he told his minor children that he was in love with another woman; in November 1968 he asked his wife for a divorce, indicating what he was doing and that he intended to keep on doing it. Under these uncontradicted circumstances, we are of the opinion that the wife was justified in refusing to have marital relations with her husband, regardless of whether or not he had established by competent evidence a permanent denial of marital relations by the wife. See *Owings v. Owings*, 148 Md. 124, 128 A. 748 (1925).

Inasmuch as the husband's desertion of the wife by leaving the marital abode on December 26, 1968, had been amply established and corroborated by the testimony offered on behalf of the wife and the defense of recrimination by reason of an unjustified refusal of marital relations not, in our opinion, having been established, the lower court erred in not granting the wife a divorce *a mensa et thoro* on the ground of desertion as prayed by her together with suitable alimony.

> *Decree of August 27, 1969, reversed in part and the case is remanded to the lower court for the passage of a decree in accordance with this opinion, the costs to be paid by the appellee.*