614 A.2d 975

**Beverly Ann KEYS**

v.

**Harvey S. KEYS.**

**No. 1503, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Oct. 28, 1992.

678

George Toda, Baltimore, for appellant.

Gerald A. Smith, Baltimore, for appellee.

Argued before MOYLAN, BISHOP, BLOOM, WENNER and FISCHER, JJ.

FISCHER, Judge.

Beverly Ann Keys, appellant, and Harvey S. Keys, appellee, were married on October 10, 1969, and two children, Tamiko and Dwayne, were born of that marriage. On December 10, 1987, the Circuit Court for Baltimore City granted an absolute divorce to the parties. The divorce order awarded to Ms. Keys use and possession of the marital home until September, 1988. The home was sold on June 30, 1990, and Ms. Keys filed a claim against the proposed disposition of the sale proceeds. On May 21, 1991, the Circuit Court for Baltimore City conducted an evidentiary hearing, and on June 4, 1991, the court issued its ruling. Ms. Keys appeals the trial court's order, and she presents the following questions for our consideration [1]:

1. Did the Circuit Court for Baltimore City abuse its discretion by granting Ms. Keys compensation for only one-half of the mortgage payments paid for the period September 1, 1985 to September 10, 1988?

2. Did the Circuit Court for Baltimore City abuse its discretion by refusing to grant compensation to Ms. Keys for the mortgage payments paid after September 8, 1988?

3. Did the Circuit Court for Baltimore City abuse its discretion by refusing to grant to Ms. Keys $2,250 for the lost value of the Ford Mustang?

---

**1.** In her brief, Ms. Keys presents five lengthy questions. We have consolidated those questions.

## I.

As the trial court order and memorandum of June 4, 1991 stated, "[A]fter a lengthy and rancorous pre-Decree period involving many battles, this Court granted [Mr. Keys] an absolute divorce on December 10, 1987, seemingly ending the war." The divorce decree: (1) awarded Ms. Keys the use and possession of the marital home, (2) ordered Mr. Keys to pay Ms. Keys alimony of $25 a week for a period of eighteen months, (3) ordered Mr. Keys to pay $70 per week for the support of Tamiko and Dwayne Keys, (4) excluded Mr. Keys as the biological father of Jamal Keys and ordered Ms. Keys to pay the $400 advanced for a paternal blood test and ordered her to reimburse Mr. Keys $140.40 for the medical expenses associated with the birth of the child, (5) ordered the sale of the 1980 Ford Mustang, and (6) awarded personal property to Mr. Keys. The decree also granted:

> [T]he use and possession of the marital home to [Ms. Keys] for a period of three (3) years from September 10, 1985. This Court holds that [Ms. Keys] shall pay the mortgage, taxes and utility bills of the marital home during the three (3) year period. In September 1988, the marital home shall be sold and the proceeds divided equally after [Ms. Keys] is credited One Thousand Three Hundred Eighty–Three Dollars and Forty–Seven Cents ($1,383.47) representing four (4) mortgage payments that should have been paid by [Mr. Keys] and after [Ms. Keys] is credited for all mortgage payments and taxes that she paid on the property from September 1, 1985 until the property is sold.

The record shows that Mr. Keys was willing to sell the marital home in September of 1988, and he notified Ms. Keys of arrangements he had made to facilitate the court ordered sale. Mr. Keys contends, and the trial judge found, that by various means Ms. Keys obstructed and delayed the sale of the home. Consequently, in December of 1989, the court appointed the parties' attorneys as trustees to sell the marital home. Finally, the property was sold for $50,000 in

June of 1990. The trustees prepared an accounting of the proceeds and concluded that $26,192.76 was available for distribution to the parties. As the divorce decree required the proceeds to be divided equally between Mr. and Ms. Keys, the accounting statement credited $13,096.38 to each of them. Also taken into consideration by the auditor were certain credits and debits outlined in the decree. The final total available for Ms. Keys was $18,845.09, and the amount available for Mr. Keys was $6,941.90. Ms. Keys takes exception to this accounting and claimed that she is entitled to all of Mr. Keys' share plus an additional $371.65.

Ms. Keys argues that the divorce decree awarded her one hundred percent compensation for mortgage payments paid from September 1, 1985 until the date the property was sold. The trial court denied Ms. Keys' claim to full compensation for the mortgage payments and awarded her compensation for one-half of the total payments made prior to September, 1988. Ms. Keys postulates that the divorce decree required Mr. Keys to reimburse her for the total amount paid. She adds that if the intent of the decree was for her to receive only one-half of the mortgage payments, as the trial court ultimately ordered, then the decree would have explicitly stated that she was only entitled to one-half. Ms. Keys notes that, instead, the decree states, "Ms. Keys is credited for all mortgage payments and taxes that she paid on the property from September 1, 1985 until the property is sold." The right of a cotenant to contribution for mortgage and tax payments is well established. *Crawford v. Crawford,* 293 Md. 307, 443 A.2d 599 (1982); *Aiello v. Aiello,* 268 Md. 513, 302 A.2d 189 (1973); *Imagnu v. Wodajo,* 85 Md.App. 208, 223, 582 A.2d 590 (1990). A *Crawford* contribution claim, however, is not a matter of right but is an equitable remedy awarded within the discretion of the court. *Broseus v. Broseus,* 82 Md. App. 183, 192, 570 A.2d 874 (1990); *Wassif v. Wassif,* 77 Md.App. 750, 551 A.2d 935, *cert. denied,* 315 Md. 692, 556 A.2d 674 (1989); *Spessard v. Spessard,* 64 Md.App. 83, 494 A.2d 701 (1985). Obviously, Ms. Keys misunderstands the

meaning of the court's words. The phrase "is credited for all mortgage payments and taxes" does not mean that she is to be reimbursed for all payments. It means that she is to receive a proper credit for all payments. The court found that a proper credit was one-half of the payments made by Ms. Keys. This, of course, results in each party paying one-half. We find no abuse of the trial court's discretion in allowing contribution for one-half of the mortgage and tax payments for the three year use and possession period.

## II.

■ Second, Ms. Keys argues that the trial court abused its discretion in denying her contribution for mortgage and tax payments made after September, 1988. Ms. Keys avers that she is entitled to contribution for all the mortgage and tax payments, including the payments after September, 1988. The trial court denied her claim for contribution for payments after September, 1988, explaining that the use and possession order was in effect for a three year period ending in September, 1988 and that "[Ms. Key's] bad faith efforts to thwart the orderly, cost-effective sale of the marital home, as ordered by the Decree of Divorce, were inexcusable." We believe the trial court did not abuse its discretion in denying Ms. Keys contribution for the payments after September, 1988.

The divorce decree stated that the marital home shall be sold in September, 1988 and that Ms. Keys is to be "credited for all mortgage payments and taxes that she paid on the property from September 1, 1985 until the property is sold." The divorce decree intended for Ms. Keys and the children to reside in the marital home for three years, and shortly after the use and possession period expired, the home would be sold. Clearly, the decree did not intend for the sale of the home to take place some twenty months after the use and possession period expired.

As we found above, contribution is an equitable remedy. Judge Rosalyn Bell, writing for this Court in *Spessard v. Spessard,* 64 Md.App. 83, 95–96, 494 A.2d 701 (1985), discussed the equitable nature of contribution:

'We point out, as we have before, that the chancellor is not required to place the parties in a position of monetary equality....' The chancellor is not precluded from allowing reimbursement to a spouse for maintaining tenancy by the entireties property, nor must he require that the spouse out of possession contribute a proportionate share of the payments. Depending on the circumstances, requiring contribution could create the very inequity which the [Marital Property Act] was designed to prevent. Hence, the test involves whether the total disposition is equitable. [Citation omitted; footnote omitted.]

In *Broseus v. Broseus,* 82 Md.App. 183, 570 A.2d 874 (1990), the husband, a Ph.D., was awarded use and possession of the marital home but was denied contribution. We concurred with the chancellor's decision "that it was unreasonable for [the husband] to expect reimbursement for his payments on their joint obligation as he was receiving the benefit of the use of the residence and since [wife's] standard of living was considerably lower than his." *Broseus,* 82 Md.App. at 193, 570 A.2d 874.

In the instant case, the trial court considered several factors in denying Ms. Keys contribution for the mortgage payments made after September, 1988. The trial court's order specifically stated:

[Ms. Keys'] bad faith efforts to thwart the orderly, cost-effective sale of the marital home, as ordered in the Decree of Divorce, were inexcusable. Because he suffered increased costs of sale, and because he acted in utmost good faith and was fully cooperative, it cannot be persuasively argued that Mr. Keys stands unjustly enriched by this court's refusal to award [Ms. Keys] contribution for the mortgage payments accruing after the expiration of the use and possession order in September, 1988.

The trial court found that Ms. Keys intentionally and willfully delayed the sale of the marital home. The court pointed to many examples of Ms. Keys' bad faith. On March 28, 1988, Mr. Keys' attorney wrote to Ms. Keys' attorney and stated that "[Mr. Keys] is insisting upon the sale of the premises...." In April, Ms. Keys' attorney responded, "My client made a proposal in March 19, 1988, regarding the transfer of [marital home], to your client. If your client changes his mind, please advise me." Ms. Keys testified that her offer to Mr. Keys was that "he wouldn't have to pay me the back money that he owed me if he allowed me to stay in the [marital home].... I offered him that he wouldn't have to pay me the mortgages that I had already paid. And, he wouldn't have to pay anything about the car." Clearly, it was not in the best interest of Mr. Keys to accept Ms. Keys' offer. In doing so, he would have bargained away his interest in the marital property in exchange for an agreement by Ms. Keys that she would not seek reimbursement for the mortgage payments. Mr. Keys would have been foolhardy to accept this offer, since Ms. Keys was only entitled to a one-half contribution from Mr. Keys and this obligation only amounted to a portion of Mr. Keys' equity value in the property. Ms. Keys also admitted that, when after several months, Mr. Keys declined her offer, she made no other effort to dispose of the property since "he wasn't bothering about selling, I just stayed there."

Finally, on February 6, 1989, Mr. Keys filed a pleading captioned "Complaint for Partition or Bill of Sale to Harvey S. Keys" asking the court to order the sale of the marital home. On December 15, 1989, the court ordered that counsel representing each party act as trustees to make such a sale. On March 20, 1990, after many attempts by the trustees to gain access to the property, the trustees filed a motion to secure the keys to the house. The motion explained that the trustees had entered into a contract of sale and that the contract was contingent upon a satisfactory plumbing inspection by the buyer. The motion stated:

6. That the Trustees have been informed that [Ms. Keys] has not made [the marital home] available for said inspection. The communications between Beverly Ann Keys and the three agents involved has not been productive.

7. That in order to complete the sale of the above property, that the plumber inspect the premises and that in the near future, the property be appraised by the Lending Institution and lastly, an opportunity to make repairs, as required by the Lending Institution or the Contract.

8. That the Trustees, do not have any keys to [the marital home] and suggest to the Court, that if they had keys they would be able to have their agents gain entrance for the plumbing inspection, appraisal and repairs.

The court subsequently ordered Ms. Keys to provide the trustees with a set of keys to the marital home. Even after the closing of the contract of sale, Ms. Keys continued to delay her move from the home:

Counsel: Do you remember the exact dates the locks were changed?

Ms. Keys: No, I do not.

Counsel: I have a bill here that indicates that the locks were changed on June 22, 1990. If I have a bill to that effect, would you dispute that?

Ms. Keys: I had already moved when the locks were changed.

Counsel: Didn't you call me back after this date, ... seeking to get access to the house to move?

Ms. Keys: Yes, I did because I couldn't get in to get the rest of my things.

Counsel: Okay. So you hadn't completed the move?

Ms. Keys: Well, I only had a few things that I had to clean up. I left some coats in the closet, I think.

Counsel: Well, Ma'am, I'm going to tell you I was in the house on June 22, and it was plenty of stuff in there on the 22nd.

At the end of questioning by counsel, the court inquired of Ms. Keys:

The Court: Mrs. Keys, you knew back in 1987, at the time of the divorce, that you only had the right to remain in the house until September of '88, correct?

Ms. Keys: Yes.

The Court: And yet, you're saying that when push finally came to shove in June of 1990, almost two years later, you had so ill-prepared to move out of the house, that it was necessary for counsel to come in and ask for court order to get you to turnover the keys, because you didn't want to move, because you weren't prepared to move.

Ms. Keys: Correct.

The Court: And, if I understand your testimony, the period from September of 1988 until you finally moved in June of 1990, you were hoping and wishing that you were going to somehow be able to work something out with your husband?

Ms. Keys: Yes.

The Court: Did your husband do or say anything at all during that period that suggested to you that he was going to be amenable to that arrangement, to any such arrangement?

Ms. Keys: No.

Mr. Keys testified that he attempted to comply with the divorce decree and have the property sold in September, 1988. He testified to the following:

Counsel: Did there come a time when you had made some efforts to have that property sold, pursuant to Judge Johnson's order?

Mr. Keys: Yes.

Counsel: Now, what was that effort? What did you do?

Mr. Keys: What I did, I went up to see Mr. Steve Campbell, a realtor. And he informed me, at that point, that he had just sold a house on Lucia Avenue which was a [one-bedroom]. And he asked me what was mine? I said it was a three bedroom. He said well, in order to get

a fair price, I need to measure the rooms, to get the square footage. So he said ... Do you mind if I call your wife. I said, no, I said she lives in the house. I said I don't have access to the house. So he called her and she answered the phone, and he had it on a speaker, and I could hear what he was saying to her, and what she was saying to him. And he said to her, Mrs. Keys, identified who he was, he identified what he wanted to do. She, at that point, told him, she said, well, I had no knowledge that this house was going to be sold, and you should talk to my lawyer.

Admittedly, the evidence available to the trial court, on the issue of Ms. Keys' refusal to cooperate, was not overwhelming up to the point at which she refused to turn over the house keys to the trustees. Ms. Keys' refusal in early 1990 to provide the trustees, including her own attorney, with a key to the house for the purpose of obtaining an inspection of the house made it abundantly clear to the trial judge that she was doing everything possible to delay the sale of the house. After considering all of the available evidence, the court concluded that Ms. Keys had delayed the sale of the home and that, under equitable considerations, she was not entitled to contribution from Mr. Keys for mortgage payments made after the conclusion of the use and possession period. The trial court found that Ms. Keys would be unjustly enriched if the court were to order Mr. Keys to pay one-half of the mortgage payments from September, 1988, since those expenditures were caused by Ms. Keys' actions in delaying the sale of the property.

The dissent is apparently premised upon the theory that, following a divorce of the parties, the co-tenant in possession has a *legal* right to contributions, and the court may not reduce the amount of those contributions despite equitable considerations. This, of course, is incorrect. The right to contributions, whether between tenants by the entireties or tenants in common, is an equitable remedy. *See Aiello v. Aiello,* 268 Md. 513, 302 A.2d 189 (1973), *Crawford v. Crawford,* 293 Md. 307, 443 A.2d 599 (1982). As Judge Bell

stated in *Spessard*, 64 Md.App. at 92–93, 494 A.2d 701,
"When tenants in common or joint tenants seek partition,
the equitable doctrine of contribution typically is applied to
settle the outstanding claims which relate to the property.
2 *American Law of Property* § 6.17." The dissent admits
that the "legal" right to contribution may be affected by an
ouster. The questions of ouster, whether between hus-
bands and wives or divorced spouses, are simply equitable
considerations. In the instant case, the trial judge consid-
ered the appellant's refusal to cooperate in a timely sale of
the marital dwelling and fashioned an equitable result.

Pursuant to Md.Rule 8–131, unless the testimony is de-
void of merit, we will not substitute our judgment for the
trial court's determination of the credibility of the witness-
es. *Colandrea v. Colandrea*, 42 Md.App. 421, 401 A.2d 480
(1979). We are bound by this oft enunciated principle,
especially in the arena of marital disputes where notorious-
ly the parties are not in agreement as to the facts, and
therefore, we must be cognizant of the court's position to
assess the credibility and demeanor of each witness. Con-
sequently, we will only overturn a trial judge's findings of
fact when the findings are clearly erroneous. *See White-
hurst v. Whitehurst*, 257 Md. 685, 264 A.2d 822 (1970),
*Cullotta v. Cullotta*, 193 Md. 374, 66 A.2d 919 (1948), *Hale
v. Hale*, 74 Md.App. 555, 539 A.2d 247 (1988), *Eckstein v.
Eckstein*, 38 Md.App. 506, 379 A.2d 757 (1977). As the
Court of Appeals declared in *Shelton v. State*, 198 Md. 405,
411–412, 84 A.2d 76 (1951), "[T]he test of legal sufficiency
in a civil or criminal case ... [is that] the evidence must
either show directly the fact to be proved or support a
rational inference of the fact. In a civil case, the fact must
be shown by a preponderance of probability, or an opposite
preponderance must be overcome." Since the trial court
had the opportunity to assess the credibility and demeanor
of Mr. and Ms. Keys, and since the court had before it
sufficient evidence from which it could conclude by a pre-
ponderance that Ms. Keys willfully and intentionally de-
layed the sale of the property, we hold that the trial court

did not err in denying Ms. Keys contribution for mortgage payments made after September, 1988.

 Ms. Keys also argues that the trial court erred in basing its decision on an erroneous belief that Mr. Keys was "ousted" from the family home. The trial court denied Ms. Keys' contribution claim for the mortgage payments after September, 1988, in part, because the trial court incorrectly reasoned that the use and possession award effectively "ousted" Mr. Keys from the home. A use and possession order is not equivalent to an "ouster." We have used the term "ouster" to describe actions by one co-tenant which preclude another co-tenant from the use and enjoyment of the property. In *Spessard*, 64 Md.App. at 88, 494 A.2d 701, we described "ouster" as:

> '[T]he actual turning out or keeping excluded the party entitled to the possession of any real property....' The exclusion does not require physical eviction, so long as 'the act or declaration constituting the ouster [is] unequivocal and notorious....' To prove ouster, one must show 'actual intent to exclude the co-tenant permanently from his rights in the property....' (Citations omitted.)

The trial court's ruling that the use and possession order "ousted" Mr. Keys from the marital home is erroneous. Mr. Keys was, however, constructively "ousted" from the home at the time Ms. Keys refused to turn over the keys. Moreover, the option of moving back into the marital home after the expiration of the use and possession order does not appear to have been available to Mr. Keys since Ms. Keys admitted that, in 1984, she stabbed Mr. Keys. As we have concluded that the trial court was not clearly erroneous in deciding that Ms. Keys delayed the sale, the trial court did not err in applying equitable considerations and in determining that Ms. Keys is not entitled to contribution for mortgage payments made after September, 1988.

### III.

 Third, Ms. Keys claims that she is entitled to one-half of the value of the 1980 Ford Mustang. The divorce

decree valued the Ford Mustang at approximately $4500 and ordered that the automobile be sold and the proceeds divided between the parties. Before the automobile was sold, however, it was impounded by the Department of Public Works and was eventually auctioned. Ms. Keys claims that the divorce decree awarded her $2,250 and she is entitled to that amount from the house proceeds. The divorce decree, however, clearly states that the "proceeds [from the sale of the automobile] be divided equally." Consequently, since the automobile was not sold by the parties and it is no longer available to be sold, there are no proceeds to be divided.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

BLOOM, Judge, concurring in part and dissenting in part.

Although I agree with most of the majority opinion, I dissent from that part thereof that affirms the denial to Mrs. Keys of what are now termed *Crawford* contributions for mortgage payments she made between September 1988 and March 1990. I believe that the majority, as well as the chancellor, have simply misconstrued the facts and misinterpreted the law relating to contributions between co-tenants.

Contrary to what the majority opinion states, a co-tenant who has laid out money to make mortgage payments, including principal and interest, taxes, and insurance, or for necessary repairs, and thus has benefitted the other co-tenant by preserving and protecting their property, is *entitled* to contribution. *Crawford v. Crawford,* 293 Md. 307, 443 A.2d 599 (1982); *Aiello v. Aiello,* 268 Md. 513, 302 A.2d 189 (1973); *Colburn v. Colburn,* 265 Md. 468, 290 A.2d 480 (1972); *Schilbach v. Schilbach,* 171 Md. 405, 189 A. 432 (1937); *Hogan v. McMahon,* 115 Md. 195, 80 A. 695 (1911). The majority opinion cites *Broseus v. Broseus,* 82 Md.App. 183, 192, 570 A.2d 874 (1990); *Wassif v. Wassif,* 77 Md.App. 750, 551 A.2d 935 (1989); and *Spessard v. Spessard,* 64 Md.App. 83, 494 A.2d 701 (1985) as support for its state-

ment that a claim for *Crawford* contributions is not a matter of right but is an equitable remedy awarded within the discretion of the court. These cases do not hold what the majority opinion suggests they hold. "Between tenants by the entireties [*i.e.*, between husband and wife prior to the passage of a divorce decree] the entitlement to contribution is an equitable matter and not a matter of right and is within the sound discretion of the trial court." *Broseus*, 82 Md.App. at 192, 570 A.2d 874. As we pointed out in *Kline v. Kline*, 85 Md.App. 28, 48–49, 581 A.2d 1300 (1990), although the right of a co-tenant to contribution for mortgage payments is well established, by virtue of Maryland's Property Disposition in Annulment and Divorce Act, Md. Code (1984) Family Law, §§ 8–201 through 8–213, a chancellor is not obliged to award such contributions *between husband and wife at the time of a divorce.* We explained that payments of money by one co-tenant to protect the common property against loss or to enhance its value gives rise to an implied or quasi contract, which entitles that co-tenant to contribution from the other co-tenant, who would otherwise be unjustly enriched.

Generally, claims between co-tenants for contribution are asserted in partition or mortgage foreclosure proceedings and are recognized as equitable claims, enforceable as equitable liens. And to the extent that one co-tenant pays the mortgage debt, he may obtain an assignment of the mortgage or at least assert a right of subrogation. *See Aiello, supra*, 268 Md. at 513, 302 A.2d 189.

Some states, however, recognize the existence of a common law action for contribution, in the nature of an action in *indebitatus assumpsit*—being indebted, he undertook (or promised). *See, e.g., Fowler v. Fowler*, 50 Conn. 256 (1882). Whether enforceable at law or in equity, it is clear that the payment by one co-tenant of more than his or her share of charges that had to be paid in order to preserve the property creates a *debt*, the ultimate payment of which by those who in equity and good conscience ought to pay it will be compelled by the court. *Id.* [268 Md.] at 519, 302 A.2d 189.

I do not believe that a court of equity has any authority to deprive the payor co-tenant of the right to collect such a debt except upon sound legal or equitable principles. One may not be denied contribution to which he or she is entitled merely because the chancellor disapproves of his or her conduct. "[C]ourts of equity 'do not sit, or effect to sit, in judgment upon cases as *custodes morum* enforcing the strict rules of morality.' " *Myers v. Myers*, 185 Md. 210, 44 A.2d 455 (1945), quoting 1 Story Equity Jurisprudence, 12th Ed. 308. Putting on his chancellor's hat, *i.e.*, presiding over a traditional equity proceeding, does not entitle a judge to ignore existing legal principles or invent new ones in order to arrive at what he thinks is an equitable result.

Law, without equity, though hard and disagreeable, is much more desirable for the public good than equity without law.[1]

Because this debt or obligation and its corresponding right or entitlement are founded on principles of equity, in a divorce proceeding the claim for contribution may be subsumed in or offset by the authority of the chancellor to achieve a more complete equity between the parties by granting (or declining to grant) a monetary award. By the time the chancellor was called upon to do equity in these proceedings, however, the parties had long ceased to be husband and wife and tenants by the entirety. Mrs. Keys was a tenant in common and, as such, lawfully entitled to *Crawford* contributions, provided she had not ousted her co-tenant.

Where there has been an ouster, the co-tenant in possession forfeits any right of contribution. *Spessard*, 64 Md. App. at 88, 494 A.2d 701.

"Ouster is the actual turning out or keeping excluded the party entitled to the possession of any real property." ... The exclusion does not require physical eviction, so

---

**1.** Wm. Blackstone *Commentaries on the Laws of England*, 1, 1765.

long as "the act or declaration constituting the ouster [is] unequivocal and notorious." ... To prove ouster, one must show "actual intent to exclude the co-tenant permanently from his rights" in the property.... ("where one co-tenant ... remains in possession ... and refuses to accede to plaintiff's demands for access to the property, such conduct clearly constitutes an ouster."). For example, possession under circumstances which evince "a claim of exclusive right and title" and which deny "the right of the other tenants to participate in the profits" may constitute an ouster.

*Id.* at 88–89, 494 A.2d 701 (citations omitted).

To the extent that Mrs. Keys, in seeking contribution, was invoking the aid of equity, she may be subject to the equity principle known as the "clean hands" doctrine. The maxim, "he who comes into equity must come with clean hands" is based on public policy and means that "courts of equity will not lend their aid to anyone seeking their active interposition, who has been guilty of fraudulent, illegal, or inequitable conduct in the matter in relation to which he seeks assistance." *Hlista v. Altevogt,* 239 Md. 43, 49, 210 A.2d 153 (1965). In applying the maxim, however, equity courts do not require litigants to have led faultless lives in dealings on all matters, but confine themselves to the effect that the alleged fraudulent, illegal, or inequitable conduct has upon the request for relief then under consideration. *Id. See also, Niner v. Hanson,* 217 Md. 298, 142 A.2d 798 (1958); *Brown v. Brown,* 199 Md. 585, 87 A.2d 626 (1952).

The meager record in this case contains not one shred of evidence that would support a conclusion that Mrs. Keys ousted Mr. Keys from use and enjoyment of the property or otherwise engaged in any fraudulent, illegal, or unconscionable conduct detrimental to Mr. Keys until March 1990, after the court appointed trustees had executed a contract of sale. Then, according to the evidence, she denied, or at least impaired, efforts by the trustees to gain access to the

property and thus delayed consummation of the sale.[2] I am willing to concede that obstructing the court-appointed trustees may be considered to be illegal or inequitable conduct detrimental to Mr. Keys. It might even reasonably be deemed to constitute an ouster of the co-tenant, whose right of enjoyment of the property, *i.e.*, to receive his share of the sales proceeds, was frustrated and delayed by Mrs. Keys's conduct. But from September 1988, when the use and possession order expired, until March 1990 when the trustees had reason to complain that they were prevented from doing their duty, Mrs. Keys did nothing that she was not absolutely entitled by law to do and she did not fail or refuse to do anything that she was obliged by law to do. There is simply nothing in the record to support the chancellor's finding, echoed by the panel majority, "that by various means Mrs. Keys obstructed and delayed the sale of the home," until March 1990. Indeed, the very idea that any conduct by Mrs. Keys could have obstructed or delayed a sale of the house at any time prior to the appointment of trustees to sell is based upon some misconception by the chancellor, adopted by my brethren, that between the time the use and possession order expired and trustees were appointed to sell the property Mrs. Keys was somehow obligated to take some action to sell or to cooperate in Mr. Keys's schemes to sell the house.

The divorce decree awarded Mrs. Keys use and possession of the marital home for a period of three years from September 10, 1985. It also stated that "[i]n September 1988, the marital home shall be sold and the proceeds divided ...," but that is a far cry from a "court ordered sale," as the majority terms it. Op. at 680. The divorce

---

2. At oral argument we were told that Mrs. Keys had been uncooperative with the trustees while they were trying to sell the property by making it difficult for them to show the property to prospective purchasers and by making disparaging comments about the condition of the property. There is nothing in the record, and thus no evidence before the chancellor, to support those assertions.

decree did not *order a sale;* it was silent as to how the property was to be sold, and it imposed no duty on either party to do anything about selling the house. The provision that the house "shall be sold" was obviously not self-executing; it was merely a recognition that after the use and possession order expired there was no judicial impediment to a sale. Consequently, as of September 10, 1988, the parties were in a situation fairly common among divorced couples: they were equal tenants in common of real property; one of them was in possession; both had an equal right of possession. Mr. Keys, being out of possession and obviously in no position to assert his own right to resume living in the house, had certain options open to him: (1) negotiate a purchase of Mrs. Keys's half interest in the property or a sale of his half interest in it to her; (2) negotiate an agreement with Mrs. Keys about making a private sale of the property to a third party; or (3) petition the court to order a sale in lieu of partition. He opted to negotiate. He made offers and/or submitted proposals that were either ignored or rejected. In return, Mrs. Keys made an offer to purchase his interest for the amount of his outstanding indebtedness to her. He rejected that offer. It eventually dawned on Mr. Keys that continued negotiations with his former wife would be fruitless, and he did what he could have done on September 11, 1988—he petitioned the court to appoint trustees to sell the property.

The termination of the use and possession order on September 11, 1988, did not require Mrs. Keys to vacate the premises. She was certainly not obliged to accept Mr. Keys's offers or accede to his proposals. It is preposterous to suggest that by remaining on the premises and continuing to pay the mortgage for the benefit of both parties until the house was sold Mrs. Keys ousted Mr. Keys or deprived him of any of his rights in or to the property. It is equally preposterous to suggest that, by ignoring or rejecting Mr. Keys's proposals for selling the house, Mrs. Keys ousted her former husband or deprived him of any right or, in the language of the court, "obstructed and delayed the sale of

the house." Before the trustees were appointed, there was no sale to obstruct or delay.

I would reverse the trial court's denial of Mrs. Keys's claims for *Crawford* contributions, at least for mortgage payments she made from September 1988 to March 1990, while affirming the other provisions of the judgment.

Judge WENNER joins in these views.