688 A.2d 479

**Richard E. PAINTER**

v.

**Linda PAINTER.**

**No. 557 Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Feb. 3, 1997.

Paul J. McGarvey, Hyattsville, for appellant.

Robert W. King, Greenbelt, for appellee.

Argued before CATHELL, HOLLANDER and THIEME, JJ.

CATHELL, Judge.

Richard E. Painter, appellant, appeals from the judgment of the Circuit Court for Montgomery County in favor of Linda Painter, appellee. The trial court 1) granted appellee an absolute divorce on grounds of constructive desertion; 2) denied all visitation to appellant with the parties' son Daniel; 3) granted limited visitation to appellant with the parties' daughter Christina; 4) ordered appellant to pay one-half of Daniel's psychiatric hospital care that is not covered by insurance; and 5) adopted appellee's S74 statement as to marital and nonmarital property. Appellant presents several questions, and subquestions, as follows:

1. Did the Court abuse its discretion in terminating any contact the appellant shall have with his sixteen (16) year old son?

2. (a) Did the Court abuse its discretion in restricting the appellant's long distance telephone conversations with his eleven year old daughter?

(b) Was it an abuse of discretion for the Court to limit the father's visitation to four hours and supervised visitation when appellant's daughter visits Maryland?

3. (a) Did the Circuit Court err in granting the appellee an absolute divorce on the ground of constructive desertion?

(b) Did the Court err in dismissing the appellant's Counterclaim for an absolute divorce on the ground of adultery?

4. Did the Court err in ordering the appellant . . . to pay to the appellee one[-]half (1/2) of all medical bills not covered by insurance for the son's treatment and psychiatric therapy?

5. (a) Did the Court abuse its discretion in granting the appellee the use and possession of the marital home for a period of one (1) year where the appellee had not lived there for eleven (11) months and where there was no testimony that she intended to return?

(b) Did the Court abuse its discretion in requiring the appellant to pay one-half (1/2) of the mortgage payment during the period of the use and possession where appellant's sole income consisting of social security had been suspended?

(c) Did the Court err in ordering that all, marital and personal property be sold and the proceeds deposited in the appellee's attorney's escrow account?

(d) Did the Court err in directing the United States Bankruptcy Court Trustee to turn over to appellee's counsel all funds resulting from the sale of the jointly owned marital home? Contradictory to the United States Bankruptcy Court Order directing the United States Trustee to pay to appellant his proceeds directly to him?

(e) Did the Court abuse its discretion in awarding the bedroom furniture, piano and television sets to the children?

6. Did the Court err in awarding the appellee, wife's attorney $15,000.00 in attorney's fees?

7. Did the Court err in finding that there was no dissipation of marital funds and property?

## The Facts

Appellant and appellee were married in 1978 and have two children, Daniel and Christina. They lived together for approximately fifteen years. Appellant was an attorney. During part of the marriage, appellee worked as a legal secretary and in real estate. She worked for appellant periodically during the marriage. Appellant was, at the time of the divorce, sixty-eight years of age and was either retired from the practice of law or was in the process of retiring.

There was considerable evidence presented to the trial court of appellant's violent behavior directed at appellee and the parties' children. Because of the large amount of evidence of violence, we shall discuss the direct violence against appellee and against the children separately where possible. We do so extensively in order to emphasize the severe domestic abuse that occurred.

### Violence Against Appellee

When asked of one episode that resulted in her leaving the home, appellee stated:

[H]e started cursing me, you goddamn, f-ing bitch. . . .

. . . [H]e jumped up . . . grabbed me and started pulling my hair and hitting me and screaming at me that I was . . . [a] bitch, et cetera . . . how stupid I was.

. . . He chased me. He picked up a hatchet . . . and started swinging the hatchet at me. *Daniel [was] standing there watching,* and Richard threw down the hatchet, got up on top of me and started pounding my head. I remember thinking this time I am going to be dead, and I called out to Daniel to help me and Daniel jumped on his father's back.

. . . I said Daniel, get off, get away, and so Daniel got off and Richard continued to beat me . . . and when he had thrown me down on the cement, my lower disk [sic] was ruptured.

... I was bedridden for the back injury, and I couldn't even get [appellant] ... to see to it that Daniel had anything to eat....

... I lay in that bed trying to figure out how to get myself and Daniel out of the house.[1] I am not sure of how many days went by, maybe 10 [days] or two weeks, but my sister came down from Baltimore and helped me pack up my car.

. . . .

... I drove to Daniel's school.... We [Daniel and appellee] got in the car ... and ... we drove to Florida....

She testified that at appellant's request, and after he told her he would not use violence against her, she returned.[2] After her return, appellant continued to abuse her verbally and "he slap[ped][her] but never to the point that [she] feared for [her] life until May 10th of 1993." She testified that on May 10, 1993, appellant was arguing with her and that he, in the presence of the children,

knocked me out of the chair ... got on top of me and started beating me.

... John [appellant's stepson] ... pulled Richard [appellant] off of me and started yelling at me to get away. I ran out the front door and I had on short shorts and I was barefoot.

... Richard came out ... and attacked me again and started kicking me down the hill towards where the pool was and John made him stop again....

She testified that appellant then talked her into going back in the house to talk things over but instead

he started again cursing me ... got on top of me ... was bashing me in the head, choking me, kicking me, and I was screaming.

---

1. The daughter, at this point, was apparently staying in Florida with grandparents.

2. This is a pattern seen frequently in domestic abuse cases.

... Richard was dragging me by the hair, and John pulled him off. . . .

. . . .

... We had nowhere to go and we had no money. We hid down at the entrance of the neighborhood.

Appellee testified that, when another stepson came to help John control appellant, appellant "was lying on the bed with the two handguns, loaded handguns laying there beside him on the night table and when he tried to talk to his dad he wouldn't respond." [3]  She continued:

We stayed outside and about 45 minutes or an hour went by, and Richard called to Daniel. Daniel was in the house, and he said I want to talk to you and your sister and your mother.

So we went in and sat down in the family room, and Richard announced that he was either going to commit suicide or kill me and he said nobody gives a "GD" about me, except for Daniel. Daniel is the only one I love. He told Christina that she was a goddamn fucking bitch just like her mother and he told me that I didn't love him and I had never loved him and that nobody cared about him and that I could just sell the house, sell everything and get the fuck out of there.

So as the evening progressed the kids went to bed, and I was afraid to go to sleep because I knew the guns were still up in his room. I sat on the sofa. I usually work until at least 2:00 in the morning anyway. I sat on the sofa in the family room and it is a two story, tall window. He came out of his bedroom and threatened me that I better get my fucking ass into the bed or I was going to start something again.

So I got up and went upstairs and got in the bed, and lay there imagining him coming down the hall to shoot me, so I slept on the floor in the bathroom.

---

**3.**  The trial court struck appellee's testimony that appellant had attempted to murder a girlfriend.

Appellee further testified that, despite this abuse, she did not leave appellant because she feared for her life if she left and because she was too ill to leave. She then testified that on November 15, 1993, she called appellant to discuss a number of real estate settlements. She testified:

> He started screaming at me that I could get my fucking ass out of the house or he would kill me when he got home.... I[had] pushed the speaker button.... The employee working for me and the courier, his son, [appellant's stepson] heard him say that.
>
> . . . .
>
> ... John Painter [appellant's stepson] heard his father threaten to kill me.... John ... said, okay, Linda, that is it. Get your stuff together and I am getting you out of here.
>
> . . . .
>
> ... [W]e went into hiding.

She then testified that as a result of a court order, she had appellant removed from the house, moved back in herself, and hired a bodyguard for a period of time at $250 per day. She ultimately was unable to keep the bodyguard because of the expense. She kept the bodyguard "[u]ntil three days before he [appellant] came after me." On February 4, 1994, a neighbor called her and told her that appellant's car was parked in the vicinity. She immediately called the police. Appellant's unoccupied car was found by the police nearby. She got the car keys and went with the police back to appellant's car. Appellant was then standing in the middle of the street. After the police patted appellant down and found two loaded handguns and ammunition on his person, he was arrested.[4] There was additional corroborative testimony of violence towards appellee.

---

**4.** Appellant is apparently presently on some type of probation arising out of this incident.

## Violence Against the Children

There was substantial evidence of appellant's violent actions toward the children in addition to that previously described when Daniel was present during an attack or attacks on appellee. Appellee testified:

A   On Daniel's first birthday Daniel was sitting in his high chair, and Richard smacked him across the face. I have a photograph of him with a black eye.

Q   Now did there come a time in 1990 when Mr. Painter had an incident with Daniel?

A   Yes, December 31st, New Year's Eve.

Q   What happened on New Year's Eve of 1990?

A   I was in the kitchen with Richard's sister, my sister-in-law.

Q   What is her name?

A   Madge Askin. It was New Year's Eve. Christina was in her room and Daniel was in the kitchen. Richard was in the family room. Daniel walked out of the kitchen through the family room, up the stairs to go to his room, and as I said before the family room is two stories high, so you can see the hallway upstairs when you are in the family room.

Richard called up to Daniel and asked him to turn the light on, which was in the second level ceiling, and in the dark when Daniel went to push the light switch he missed the light switch and he pushed the fan switch and the fan came on.

Richard jumped up out of the chair, started screaming and yelling and cursing you goddamn, fucking, stupid whatever and ran up the stairs towards Daniel. I came out of the kitchen and as I came out I saw Richard upstairs. He had Daniel by the head and was taking Daniel and throwing him into the wall with his head.

I screamed at Richard to please stop, and I was crying and screaming stop. I ran to go upstairs to help Daniel. Richard just like shoved Daniel and then turned and was

coming down the stairs toward me, you stupid, fucking bitch, I told you when I am dealing with him—I don't remember the word he used.

When I—in other words, I was never allowed to interfere with him and the children and he was warning me that he had told me that before. So I turned around and I went into the kitchen. He came after me in front of my sister-in-law, grabbed me and started beating me.

Q Are there any other incidents when he has been violent with Daniel?

A Yes.

Q Can you relay those to the Court and give approximate dates?

A In approximately 1989, whenever he would fly off and he would be upset. One time on the staircase in front of the house he grabbed ahold of Daniel and was just throwing him into the wall. Other times he grabbed Daniel around the neck and choked him. When we were visiting my sister-in-law he attacked Daniel and was choking him and Daniel couldn't breathe.

. . . .

A We were visiting in Florida at his sister's house, apartment, condo and he had taken Daniel into the powder room and was beating him in there, and my sister-in-law went in there and tried to help Daniel and Richard turned on her and shoved her out of the room and told her to mind her own business, that what he was doing with Daniel was none of her business.

Q What about Christina? Has he been violent with her?

A He has been verbally abusive with Christina every day of her life. One incident right after first grade started, she didn't live with us very much.

Q Why didn't Christina live with you?

A He doesn't like her. When he found out that she was extremely intelligent through some psychological testing, he decided that she was coming home to go to school.

. . . .

Q   You indicated that he was verbally abusive to Christina?

A   Yes.

Q   Would you tell the Court what that consisted of?

A   You are nothing but a fucking, goddamn bitch, just like your mother.

Q   How old was Christina when he would tell her that or when he first started telling her that?

A   From the beginning.  Well, he would call her a brat when she was a baby, a fucking brat, and then as she got older and was walking and talking he would say the other.

Q   Now were there any incidents of physical abuse of Christina?

A   Yes.

Q   Would you tell the Court about that?

A   One time in a restaurant in Burtonsville she wanted milk or she wanted orange juice and he wanted her to have milk.

. . . .

A   She was about five years old on a Sunday.  I did keep a journal.

Q   What happened?

A   We went every Sunday out to breakfast, and we were sitting there and he was telling her what she had to order to drink.  She didn't want to order that and when the waitress walked up she ordered what she wanted to order, and he reached across the table with his close fist and slugged her.

Q   Did he hurt her?

A   Yes.

Q   Did she have to go to the doctor or hospital?

A   No.

Q   Were there any other incidents?

A   Well, during the first grade, the second day of school she was sitting at the kitchen counter eating breakfast, and

he demanded that you pay homage to him and when she was ignoring him, he was getting ready to leave, he started cursing her.

So she went to reach to kiss him and she mussed [sic] up his hair, and he swung around and just took his hand around her neck and started squeezing until she couldn't breathe and she turned red.

I started screaming at him to stop, and right then the car pool that I was in pulled up in the driveway to get her and he stopped. She was sitting there crying, so I took her outside and consoled her and he told her to get in the car and leave.

Q Were there any other incidents with Christina?

A Not other than shoving her, pushing her. He usually verbally abused her.

In addition to battering his wife and children, appellant also battered the family dog. There was testimony that he would beat and kick Christina's dog. He once threw it off the second story in front of Christina and appellee. Finally, the dog bit him.[5] After the dog bit him, appellant threw it against the wall.

We shall address other facts as necessary as we resolve the specific issues.

### The Law

We restated the standard for our review of a civil action involving most marital disputes in *Keys v. Keys,* 93 Md.App. 677, 688, 614 A.2d 975 (1992):

Pursuant to Md.Rule 8–131, unless the testimony is devoid of merit, we will not substitute our judgment for the trial court's determination of the credibility of the witnesses. *Colandrea v. Colandrea,* 42 Md.App. 421, 401 A.2d 480[,

---

**5.** Christina's dog was, apparently, possessed of a large degree of canine perspicaciousness. "Even a dog distinguishes between being stumbled over and being kicked." Oliver Wendell Holmes, Common Law, Vol. 3 (1881).

*cert. denied,* 286 Md. 745] (1979). We are bound by this oft enunciated principle, especially in the arena of marital disputes where notoriously the parties are not in agreement as to the facts, and therefore, we must be cognizant of the court's position to assess the credibility and demeanor of each witness. Consequently, we will only overturn a trial judge's findings of fact when the findings are clearly erroneous. *See Whitehurst v. Whitehurst,* 257 Md. 685, 264 A.2d 822 (1970), *Cullotta v. Cullotta,* 193 Md. 374, 66 A.2d 919 (1949), *Hale v. Hale,* 74 Md.App. 555, 539 A.2d 247[, cert. denied, 313 Md. 30, 542 A.2d 857] (1988), *Eckstein v. Eckstein,* 38 Md.App. 506, 379 A.2d 757 (1978).

We recently noted, in *Lemley v. Lemley,* 109 Md.App. 620, 627–28, 675 A.2d 596 (1996), that

[t]o prove that a chancellor's decision was clearly erroneous is an extremely heavy burden. "The chancellor's decision in a contested custody case, frequently among the most difficult a judge is called upon to make, is of critical importance.... It is unlikely to be overturned on appeal." ... A finding of a trial court is not clearly erroneous if there is competent or material evidence in the record to support the court's conclusion. [Citations omitted.]

### Resolution of Questions 1 through 4

Questions (1) visitation with Daniel; (2) visitation with Christina; (3) the grant of an absolute divorce to appellee on constructive desertion grounds; and (4) Daniel's past medical bills.

### 1.

### Visitation with Daniel

■ At the time of the trial court's decision, section 9–101.1 of the Family Law Article provided that in a proceeding concerning custody or visitation, a trial court "may consider" evidence of abuse by a party against "the other parent of the party's child" and against "any child residing in the party's

household." [6]   Md.Code (1984, 1991 Repl.Vol.), § 9–101.1 of
the Family Law Article (hereinafter FL).   Section 9–101
provides that

if the court has reasonable grounds to believe that a child
has been abused ... by a party to the proceeding, the court
shall determine whether abuse or neglect is likely to occur if
custody or visitation rights are granted to the party.

... Unless the court specifically finds that there is no
likelihood of further child abuse or neglect by the party, the
court shall deny custody or visitation rights to that party,
except that the court may approve a supervised visitation
arrangement that assures the safety and the physiological,
psychological, and emotional well-being of the child.

FL § 9–101.

In the case *sub judice,* in his oral opinion, the trial judge,
after describing the "vicious" attacks against appellee, some of
which occurred in the presence of Daniel, stated:

But I think this is a case where the history has to be
considered in this matter.   I have had an opportunity to
speak to Daniel on three occasions in my chambers.

He is an intelligent, sensitive young man who is very
aware of what has gone on in his family.   It is clear to the
Court that Mr. Painter's actions in the past have terrified
Daniel, that he remains afraid of him, that he is concerned
that his mental stability is such as to not provide the safety
that Daniel, I believe, thinks that he needs in order to deal
with his father.

I can, from my observations of Mr. Painter in this trial,
Mr. Painter is a person of explosive temper who is not able
to contain it.   He may be better than he was in that respect,
but nevertheless, he is not one who I would, given Daniel's
most recent condition, be one that I feel comfortable in
granting visitation.

---

**6.**   Section 9–101.1 has since been amended to require other protective
measures.   *See* Md.Code (1984, 1991 Repl.Vol., 1996 Supp.), § 9–101.1
of the Family Law Article.

Daniel is almost 16 years old. He is mature. He is [a] junior in high school. He indicated to me, as the record reflects, that at some time he would want to have visitation but not now. When that would be, the Court does not know.

Because of the sensitive mental health situation of Daniel at this time, I think it would be most imprudent for me to grant visitation or any contact with his father for some time now.

There was also evidence that the abuse described caused serious emotional problems for Daniel. The record before the trial court included the transcript of the testimony of Dr. Joseph Currier, Daniel's treating psychologist at the time of the June 1994 Master's hearing on visitation.[7] His testimony at that time indicated that he believed that Daniel related to his mother both as her protector from appellant and as a child seeking protection from his father. He diagnosed Daniel as either having, or having had, a "major depression" and "anxiety," and having "some symptoms and signs of a post-traumatic stress disorder" and a suggestion of "conversion symptomatology," where emotional issues are translated into "physical pain or symptoms." He noted that Daniel

reports that he lost 16 pounds in the last month or two, sleep problems, recurring dreams and the expectation of something bad, something violent is going to happen either to him or his family.

Dr. Currier later testified that Daniel "was on the one hand trying to build a relationship with his father, but at this point he was very frightened to do that." Dr. Currier then discussed Daniel's treatment plan. He was asked how Daniel expressed his feelings and he responded:

---

7. As we sometimes do when necessary to understand fully an issue or argument, we have gone into the record to obtain Dr. Currier's testimony. "The fact that a part of the record is not included in the record extract shall not preclude . . . the appellate court from considering it." Md.Rule 8–501(c).

A   A great deal of fear, a great deal of anger, a great deal of frustration, a great deal of guilt, wanting to make sure that he wasn't put in situations that would just simply frighten him more or push these feelings more.

Q   And what was the basis for this fear?

A   Much of it was whether he'd be asked to see his father. . . .   [H]e felt that in the past there was . . . some behaviors that were just very threatening or overwhelming to him or the family.

. . . .

A   He talked of a great deal of verbal threats, some physical contact.   He reported a number of incidences where on a one to one with his father he felt very overwhelmed and frightened.

Ultimately, Dr. Currier opined as to a visitation relationship between appellant and Daniel:

[A]t this point it would offer a number of problems. . . . [H]e [Daniel] is still . . . coming apart emotionally and any extra stress at this point would push him in that direction, and I worry about some possibilities of abusive behavior to demonstrate . . . how much of a need, how much pain he has.

. . . [A]ny new stresses, any additional stresses, and his perception is that it would be very, very stressful to be on [o]ne to one with his father or even with some supervised visits.

He was then asked a more specific question:

Q   Do you think that visitation with his father could be detrimental to him?

A   At this point, I don't think it would be in his best interest.   Detrimental is kind of a difficult word, meaning would it cause more harm.   I believe it would.

Later, he opined, "I worry that he [Daniel] would act in and might hurt himself."

On cross-examination Dr. Currier testified as to the effect of having appellant and Daniel in closely supervised visitation contacts:

Part of the post-traumatic stress syndrome is that he [Daniel] really believes ... the next second is going to have some type of conflict or danger for him, and to ask to put him into that situation would be like asking someone who's afraid of snakes to let me bring a snake into the room.

... [I]t might throw him over that emotional edge and cause more conflict.

We were informed at oral argument, without contradiction, that after Daniel's last visit with appellant, Daniel attempted to commit suicide. Additionally, in several meetings with the trial judge, Daniel, then sixteen years of age, informed the judge that, for the time being, he desired no contact.

That evidence that we have described, if believed by the trial court, as apparently it was, was more than sufficient to support the trial court's decision. Given the extreme and unusual factual circumstances as to violence, and given Daniel's closeness to the age of majority, the denial of visitation was not an abuse of discretion.

### 2.

### Visitation with Christina

That evidence that we have heretofore described, if believed by the trial judge, as apparently it was, was also sufficient to sustain the trial court's limitations placed on appellant's telephone and in-person visitation with Christina. The court neither erred nor abused its discretion.

### 3.

### The Granting of a Divorce

The trial court, in its oral opinion, stated:

I have, of course, considered all of the evidence that has been presented, the documents that have been introduced,

and as to the divorce, the Plaintiff [appellee] has proven her case of constructive desertion.

It is true that Mr. Painter not only physically attacked her but verbally threatened her life in the presence of other people and I can't see any stronger case for a constructive desertion.

The attacks were vicious, not only the physical attacks but verbal attacks, let alone the attempts or the verbal threats to kill her and the last incident of the guns. So we will grant a divorce to Mrs. Painter on the grounds of constructive desertion.

We have described that evidence of the abuse that appellant inflicted upon appellee, and their children, that supports the trial court's findings and conclusion. We shall not address it here again except to note that the continuing pattern and degree of abuse and violence that the evidence indicates is almost unparalleled in recent cases before this Court. What is not fully understandable, except perhaps by a reluctance on the part of appellee to prosecute him, is why appellant has not been subject to lengthy incarcerations for the various criminal acts that the evidence indicates he committed against the members of his own family. In short summation on this issue: A woman is not required to be a homicide victim before grounds for constructive desertion are established. The cowardly and despicable acts of violence found by the trial judge based upon sufficient evidence then before him not only permitted the trial judge's action, but compelled it. Judge McGuckian neither erred nor abused his discretion in granting appellee a divorce on constructive desertion grounds. Having affirmed the trial court's granting of a divorce to appellee, we, under the circumstances of this case, need not address appellant's counterclaim and the trial court's disposal of that claim in that no alimony was awarded below.

## 4.

## Daniel's Past Medical Bills

This issue apparently arose out of a previous court order, based upon a master's recommendation, that the parties

share equally in the costs of Daniel's then pending treatment—treatment intended to be completed by the time of the court's final order. A February 1, 1995, order provided:

ORDERED, that the defendant shall promptly transfer $1,000.00 to the plaintiff's attorney, Robert King, Esquire, for placement in Mr. King's escrow, as initial payment toward the services of an appropriate mental health therapist, to treat/evaluate/recommend with respect to visitation by the minor child, Daniel, with the defendant. Both parties and the defendant's therapist, Dr. Jarvis, are to cooperate with the mental health therapist as requested by the latter; and it is further

ORDERED, that final allocation between the parties of the payment of the mental health therapist will be the subject of further order of court.

In its final order, the court directed that the charges (the charges already incurred) were to be paid as follows: "Mr. Painter to pay one-half of whatever the hospital costs are for the psychiatric hospital that is not covered by health insurance."

No evidence as to any bills, other than those covered in the previous order of the court, is contained in either the extract or appellee's appendix. Thus, the only evidence is that this order contemplated the payment of past bills, *i.e.*, those incurred as a result of the court's previous order. As such, it was not an order for future payments, we do not construe it as such, and appellee concedes that it is not. Because the order was not for future payments, it was not subject to the child support guidelines. We perceive no abuse of discretion in the court's order requiring appellant to pay his share, one-half, of the uninsured portion of his son's medical expenses.

### Resolution of Questions 5 and 7

Questions (5)(a) the use and possession of the family home; (b) the copayment of the mortgage on the house; (c) the court's order that certain marital property be sold; (d) the court's order directing that the proceeds of the sale be

transferred to appellee's counsel; (e) the court's order awarding personal property, *i.e.*, bedroom furniture, piano and television sets to the children; and (7) the dissipation of marital funds and property.

■ These issues are not preserved. Appellant has thus waived his right to present these questions for our review.[8] We explain.

During his testimony in respect to property matters, appellant, addressing the court, stated:

MR. PAINTER: Just a minute, Your Honor. You didn't let me finish.

THE COURT: I thought you did.

MR. PAINTER: No, I did not. Several of those [antique lamps], at least four or five of them, I had before she moved in. We added to the collection during our marriage. I don't even know how many were there, but they are there. There were four shelves of them. I must have had at least five or seven of them before then.

THE COURT: How many of them are there? Do you remember?

MRS. PAINTER: There are probably 10 or 12 and we collected them all together.

MR. PAINTER: No, we did not. Also not listed on here that I would like to add there are a couple of antique leather cards.

MRS. PAINTER: That we bought together at an auction.

MR. PAINTER: Your Honor, just do anything that you want, Your Honor. We are not going to get any truth from her on this stand. I don't really care what you do on anything.

It ... has just gotten to the point of being utterly ridiculous. She couldn't tell the truth if her life depended upon it, and she hasn't once in this court yet.

---

**8.** Because of subsequent proceedings, we shall address 5(d) separately even though we do not perceive that it was initially preserved.

I had a complete furnished home, living very comfortably before I ever knew her. She walked in with the shirt on her back and that is it.

THE COURT: All right, is that [referring to appellant's prior statement "just do anything you want, Your Honor, ... I don't really care what you do on anything."] what you want to do?

MR. PAINTER: I don't really care, Your Honor. You do what you want. I haven't got a shake in this court so far, and I am not going to get one now. So do whatever you want.

THE COURT: Okay, so I will say the rest is marital property then. Okay, what else do we have to do?

. . . .

THE COURT: Let the record reflect that the Defendant [appellant] has stalked out of the courtroom. We will proceed. Go ahead.

The court then did what it wanted, which is precisely what appellant told it to do. There is nothing else in the extract to support the positions appellant now asserts.[9] The court was told to do what it wanted to do—it did. Moreover, the decision of the trial judge on these questions was supported by the evidence. Mrs. Painter's testimony regarding her involvement in the operation of the business and home, use of marital funds, handling of property, and categorization of property as marital and nonmarital on her Rule S72 and Rule S74 forms was apparently accepted by the trial court. We recently approved a trial court's utilization of the information contained on these forms to establish what is marital property and to establish its value, even in the absence of other evidence. *Beck v. Beck,* 112 Md.App. 197, 684 A.2d 878 (1996). Additionally, the court acknowledged the agreement of appellant, through his counsel, after appellant "stormed out" of the court room. Appellant, through his counsel, agreed to the court's

---

**9.** The extract's inclusion of the various evidentiary and testimonial exchanges is exceedingly sparse.

division of the personal property, including the vehicles and the piano.[10] The court subsequently noted, "the piano, the children's furniture and the TVs will go to the children . . . by agreement." There was no objection to the trial court's characterization. It then ordered the sale of most of the remainder. The court then discussed its proposed order in respect to the proceeds from the sale of the house without any exception being taken.

From the state of the extract presented to us, we cannot find where appellant brought these various issues to the attention of the trial court in such a fashion that they were adequately preserved. However, due to the subsequent actions of two courts, we shall address appellant's Question 5(d).

### Resolution of Question 5(d)

Question (5)(d) disposition of the proceeds from the sale of the marital home.

Subsequent to the trial court's orders that are the subject of this appeal, there were other proceedings before a U.S. Bankruptcy Court and then before the trial court.

■ The Bankruptcy Court declared that the previous trial court order that directed the Bankruptcy Trustee to turn certain proceeds over to appellee's counsel was a nullity in that the Bankruptcy Court had not consented thereto. The Bankruptcy Court, in effect, then stayed its order by directing the trustee not to distribute the funds to appellant for forty-eight hours, so as to afford an opportunity for the trial court to reconsider the matter of the distribution of the proceeds.

As a result, the trial court enjoined appellant, not the trustee, from "cashing, depositing, or otherwise negotiating the check from the bankruptcy trustee and ordered appellant to immediately turn the check over to [appellee's counsel] for deposit in a court account pending further order of the court." That order was appealed to this Court by Order of Appeal

---

**10.** We cannot discern whether or not the court ordered the china sold, but whatever it proposed to do with the china was not excepted to.

filed on October 28, 1996. A motion to consolidate the two appeals was subsequently filed by appellant and granted by this Court with the provision that no further briefs were required.

■ As is clear, appellant's Question 5(d) was resolved by the Bankruptcy Court when it declared the prior circuit court order, directing the trustee's dispersal of funds, to be a nullity. The circuit court has since issued injunctive relief directed at appellant, not the trustee. Accordingly, the argument made in argument 5(d) is moot. Moreover, for the same reasons we have given above, *i.e.,* appellant told the trial court to do what it wanted, the underlying decision to direct the proceeds (first by an order directed to the trustee and now by an order directed to appellant) has been waived and is not preserved for our review.[11] Under circumstances such as those here present, where there is evidence to support what a trial court ultimately does, parties must be careful not to say what they do not mean lest an appellate court later determine that they meant what they said. In sum, in circumstances such as those here present, a party should be careful not to tell a court that it can do what it wants, effectively agreeing to the manner in which the marital property dispute is resolved, and then appeal to us for relief from what he or his counsel either expressly or at least tacitly agreed to.

That leaves us only to resolve Question 6.

### Resolution of Question 6

Question (6) attorneys' fees.

■ We initially note that during the hearing, appellee testified that she owed approximately $19,000 to her prior attorneys and had agreed to pay her then attorney $10,000 to represent her. She was asked how many hours she had been

---

11. The trial court is reminded that it does not have the power to direct any disbursement of proceeds that results in a transfer of property. The proper manner in which to adjust the equities in property is by way of an adjustment in a monetary award.

with her attorney when he was working on her case. She responded, without objection,[12] that it exceeded eighty hours. She later testified, over a general objection, that she considered her counsel fees to be reasonable.[13]

Appellant, on appeal, grounds his counsel fee objection as follows: "Appellant contends that there should have been no award of counsel fees to the wife because the wife had converted to her own use marital funds ... [and] that the lower Court never considered Appellant's financial circumstances in ordering him to pay $15,000.00 in counsel fees." Because we are reversing the trial court's award of counsel fees for another reason, we need not address appellant's conversion argument.

We cannot discern upon which basis the award of counsel fees was made. Section 12–103 of the Family Law Article provides:

(a) *In general.*—The court may award to either party the costs and counsel fees that are just and proper under all the circumstances in any case in which a person:

(1) applies for a decree or modification of a decree concerning the custody, support, or visitation of a child of the parties; or

. . . .

(b) *Required considerations.*—Before a court may award costs and counsel fees under this section, the court shall consider:

(1) *the financial status of each party;*

(2) the needs of each party; and

(3) whether there was substantial justification for bringing, maintaining, or defending the proceeding.

---

**12.** Appellant objected to the phraseology of the question. Appellee's counsel then rephrased the question, and it was answered without further objection.

**13.** She had been a legal secretary and had worked in appellant's law offices.

(c) *Absence of substantial justification.*—Upon a finding by the court that there was an absence of substantial justification of a party for prosecuting or defending the proceeding, and absent a finding by the court of good cause to the contrary, the court shall award to the other party costs and counsel fees.

FL § 12–103 (some emphasis added).

It appears that the trial court may have addressed the needs and financial status of appellee. However, we are unable to discern whether the trial court considered the then current ability of appellant to pay counsel fees in the sum of $15,000.[14]  For that limited reason, we shall vacate only the award of counsel fees and remand for the court to reconsider its award of counsel fees in light of the requirements of section 12–103.  "In a case in which bills for legal services are challenged, [the trial court] ought to state the basis for his decision so it can be reviewed, if necessary, on appeal." *Randolph v. Randolph,* 67 Md.App. 577, 589, 508 A.2d 996 (1986) (concerning the reasonableness of legal bills).  In all other respects, we shall, for the reasons stated, affirm.

Due to the seriousness of the problem of domestic violence in our society and the extreme example of domestic violence contained in this case, we commit this case to the reporter in order that the facts contained herein may be preserved as examples of the seriousness of this, all too frequent, recurring problem and to again emphasize that a woman is not required to be a homicide victim in order to establish the elements of constructive desertion.

**JUDGMENT AS TO COUNSEL FEES VACATED; JUDGMENT OTHERWISE AFFIRMED; CASE RE-MANDED FOR A RECONSIDERATION OF COUNSEL**

---

**14.** Appellant argues in his brief that appellee only claimed attorney's fees of $10,000.  That is incorrect.  In her prayers, appellee prayed for all reasonable attorney's fees.  There was testimony that she had either paid or still owed $19,000 to her prior attorneys in addition to the $10,000 she owed her then attorney.

**530**

FEES ONLY; ALL COSTS TO BE PAID BY APPEL-LANT.