*Lyonel Jose, Jr. v. Sandra Jose (Farnham)*, No. 782, September Term 2017.  Opinion by Kenney, J.

**FAMILY LAW – CHILD CUSTODY – PHYSICAL CUSTODY**

Father was in the military and stationed in California when Daughter was between ages two and seven.  During this time and when his deployment schedule permitted, she spent four months a year with Father in California, while Mother had primary physical custody in Maryland.  In 2015, after Father's military obligations concluded, he moved back to Maryland and sought joint legal and shared physical custody.

Once it is determined that a material change has occurred by a parent moving closer to the child, the trial court must consider the best interests of the child in determining physical custody and a visitation schedule, by evaluating the guiding factors laid out in *Montgomery County Dep't of Soc. Servs. v. Sanders*, 38 Md. App. 406 (1977) and *Taylor v. Taylor*, 306 Md. 290 (1986).

In considering the *Sanders-Taylor* factors related to the fitness of the parents, their adaptability to the tasks of custody, the previous length of separation, and the past agreements between the parties, the court made findings either without a basis in the record or without adequately explaining the relevance of its findings to the totality of the present-day circumstances.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 782

September Term, 2017
_____

LYONEL JOSE, JR.

v.

SANDRA JOSE (FARNHAM)
_____

Wright,
Arthur,
Kenney, James A., III
      (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Kenney, J.
_____

Filed:  June 27, 2018

Lyonel Jose, Jr. ("Father"), the appellant, and Sandra Farnham, formerly Sandra Jose, ("Mother"), the appellee, are the divorced parents of a now eight-year-old daughter ("Daughter"). This case comes a second time to this Court following our remand to the circuit court in *Jose v. Jose*, No. 1213, September Term, 2016, slip op. (filed Mar. 10, 2017). Father again challenges the judgment of the Circuit Court for Anne Arundel County regarding his request to modify the legal and physical custody arrangement of Daughter. He asks in this timely appeal:

> [Did the] trial court err[] by not awarding the parties joint legal and physical custody?

For the reasons that follow, we affirm as to legal custody, but vacate and remand as to physical custody.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts were thoroughly presented in the "Facts and Proceedings" section of the earlier unreported opinion, from which we will summarize briefly.

Father and Mother, who both grew up in Maryland, were married on December 29, 2006. Daughter was born on November 14, 2009. When the couple divorced in 2012, Father was on active duty in the United States Marine Corp ("USMC") and stationed in California. Mother lived and worked in Maryland.

Under a Voluntary Separation and Property Settlement Agreement (the "Agreement") executed on July 12, 2012, the parties shared joint legal custody of Daughter, with Mother having tie-breaking authority. Mother had primary physical custody of Daughter in Maryland, and Father had rights of access and visitation. The

Agreement provided two different schedules for Father's access/visitation, one before and another after Daughter started pre-kindergarten. We will refer to them as the "pre-school schedule" and the "school schedule." Under the pre-school schedule, Daughter would live with Father 120 days per calendar year in California. Father and Mother would alternate Christmas holiday periods, and Father would have reasonable visitation with Daughter when he was in Maryland. After she started school, Daughter would be in Father's care from one week after the end of the school year until two weeks prior to the new school year, in addition to her Spring and Thanksgiving school breaks each year. Christmas holidays would continue to be alternating.

The parties operated under the pre-school schedule until June 2015, when Father was medically discharged from the USMC and moved back to Maryland. At that time, Daughter was five years old and about to begin kindergarten. Operating under the pre-school schedule, Daughter had lived with Father in California from April 2015 through July 2015.

Father filed a motion to modify custody, visitation, and child support on June 19, 2015. He alleged that the Agreement was designed to conform to his military status while living in California, but that he was now discharged and living in Glen Burnie, Maryland, about 30 minutes from Mother's home in Bowie. He further alleged that Daughter would "suffer severe emotional and physical harm if custody [was] not modified," and that it would be in Daughter's best interest to "live with both parties equally."

In late August 2015, Daughter began kindergarten at Four Seasons Elementary School, a public school near Gambrills, which is where Mother now lived and about 15-20 minutes from Father's home. Operating then under the school schedule, Father received limited daytime visitation and only about two overnights from August 2015 until December 2015. Father made numerous requests via email to Mother for visits, weekday dinners, and weekend overnights with Daughter in September, October, and November 2015. Mother declined these requests because, in her view, they were too disruptive to Daughter's routine.

In January 2016, pending resolution of the modification litigation, the parties agreed to an interim visitation schedule that Mother proposed. Father would have alternating weekend visitation (from Friday after school until Sunday at 5 p.m.) and weekly Wednesday night dinner visits. The parties followed this schedule until the modification hearings concluded.

After Mother filed her answer and a cross-motion, the circuit court held an evidentiary hearing over two days, May 31, 2016 and June 1, 2016. Father testified and called his wife, Jacquelyn Jose ("Jacquelyn") to testify; Mother testified and called her mother, Margaret Farnham, and her partner, Cyrus Verrani ("Cyrus"), to testify. Both Mother and Father testified about disputes over access to Daughter that had arisen since Father's return to Maryland and their difficulties in communicating with each other. They primarily communicated by email and text, with, at times, Jacquelyn and Cyrus acting as intermediaries.

For example, the parties had disputed the appropriate medical treatment for Daughter's amblyopia, more commonly referred to as "lazy eye." Daughter had seen two ophthalmologists in the same practice, both of whom recommended patching therapy. One of them also recommended additional vision therapy.[1] Mother sought another opinion from a third ophthalmologist in a different practice, who recommended a change in Daughter's eyeglass prescription to correct the issue without any other therapy or treatment. Mother wished to follow the third recommendation; Father disagreed. While Mother was on a trip to New Zealand, Father took Daughter to see a fourth ophthalmologist who also recommended patch and vision therapy. Mother, exercising her tie-breaking authority, decided not to pursue patch or vision therapy.

On another occasion, there was confusion and conflict over Mother's desire to acquire a passport for Daughter for international travel. Mother, who had plans to take Daughter to Niagara Falls, Canada for Daughter's birthday, had emailed Father about the feasibility of a passport for Daughter. Father was open to obtaining a passport, but was hesitant to consent without definite travel plans in place. After much discussion, those travel plans were eventually dropped. Mother reached out again requesting a passport for

---

[1] Amblyopia is a condition of poor vision in an otherwise healthy eye. A standard treatment combines patching therapy, which consists of "covering a child's better-seeing eye with a patch for two hours a day to improve vision in the weaker eye," and non-invasive brain stimulation techniques. *See Extended daily eye patching effective at treating stubborn amblyopia in children*, NAT'L INST. OF HEATH (Sept. 20, 2013), https://perma.cc/RG8X-LEGH; Robert F. Hess and Benjamin Thompson, *Amblyopia and the binocular approach to its therapy*, 114 VISION RESEARCH (Sept. 2015), https://doi.org/10.1016/j.visres.2015.02.009.

Daughter to travel with her to New Zealand for Cyrus's sister's wedding. Father took issue with the lengthy absence from school, and declined to consent; Daughter did not go on that trip.[2]

Both parties agreed that Daughter was doing well in school and was a happy and thriving young girl. She was close to both parties, to their respective significant others, to her baby half-sister, born to Mother, and to her maternal and paternal grandparents. And, when she was in one parent's care, she missed the other parent.

They also agreed that it was in Daughter's best interest to spend time with both of them and that each is a fit parent. As to physical custody, Father wanted a shared custody arrangement, such as a "2-2-5"[3] schedule. He argued that, while his military service in California had complicated custody, his discharge and return to Maryland resolved that issue and evidenced his desire and ability to share custody. Mother asked the court to modify visitation to maintain the interim schedule that they had been following during the school year, with Father having alternate weekends, Wednesday night dinners, and in the summer, from one week after the last day of school until one week before the start of school.

As to legal custody, Father asked the court to grant joint legal custody, but eliminate tie-breaking authority because Mother had abused it by using it to shut down

---

[2] The circuit court ordered that the parties cooperate to obtain a passport for Daughter, which would be kept in Mother's possession under certain conditions.

[3] Also known as a "2-2-5-5" schedule, it is a two-week rotation, where one parent has Mondays and Tuesdays overnight. The other parent has Wednesdays and Thursdays overnight. They alternate the Friday-Saturday-Sunday overnights each week.

discussion.  Mother asked the court to preserve her tie-breaking authority because she and Father often were unable to reach a mutual decision on important issues concerning Daughter.

At the outset of the hearing, the court had asked and the parties had affirmed that they were stipulating to a material change in circumstances.  The court then directed them to "move to the best interest phase for purposes of litigating the matter."  However, in its opinion and order entered on August 18, 2017, the court found that Father had failed to provide sufficient proof of a material change of circumstances and, as a result, it did not engage in a best interest analysis.  It ordered that the parties continue to share joint legal custody of Daughter, with Mother continuing to have tie-breaking authority.  It further ordered that Mother have primary physical custody of Daughter, and altered Father's access/visitation schedule, which we summarized as follows:

> [The circuit court] proceeded to grant Father visitation on alternating weekends, from 6 p. m. on Friday and to 6 p.m. on Sunday; for two weeks in the summer; on Father's Day (if on a non-access weekend) from 10 a.m. until 7 p.m.; and on Daughter's birthday from 10 a.m. until 2 p.m. (if a non-school day) or from 4 p.m. to 6 p.m. (if a school day). It fashioned an alternating schedule for holidays and breaks, giving Father access to Daughter in even years on New Year's Eve through New Year's Day; Memorial Day; the Thanksgiving holiday from Wednesday at 6 p.m. through Sunday at 5 p.m.; and on Christmas Eve from 4 p.m. until 7 p.m. In odd years, it granted Father access to Daughter during her spring break from the day after school ends, at 10 a.m., until the day before it resumes, at 4 p.m.; and on Independence Day, Labor Day, and Christmas Day. The court did not grant Father Wednesday night dinner visitation (or any weekday access, except in the summer).

*Jose*, slip op. at 13.

On appeal, this Court vacated the judgment, holding that there was legally sufficient evidence of a material change in circumstances affecting the Daughter's welfare with respect to both legal and physical custody. We remanded the case for the circuit court to proceed with an analysis of whether the modification sought by Father would be in Daughter's best interest. We added that, on remand, "the circuit court may request additional briefing and hold additional evidentiary proceedings, if necessary, to consider the parties' current circumstances if they have changed from the time of the hearing." *Jose*, slip op. at 27.

On remand, the circuit court held a scheduling conference, at which both parties agreed that there had not been changes in circumstances since the last hearings, and agreed to file memoranda in lieu of an additional hearing. The circuit court, on May 23, 2017, entered a revised opinion and order. After evaluating the relevant factors and making findings of fact, it arrived at the same conclusion as before with regard to both legal and physical custody:

> Based on the foregoing considerations and the evidence herein, and weighing all of the factors as to both legal and physical custody, it is found to be in the minor child's best interest to be in the joint legal custody of the parties, with tie-breaking authority vesting in [Mother]. In sum, the determining factors as to primary physical custody are caretaking of the child by her mother, from an early age, which resulted in a stronger bond, a consistent parenting style and a structure to the child's day-to-day living that should not be disturbed. Regular and consistent access by the father will provide the child with all of the benefits of having two parents in her life. The Court finds that the minor child should be in the primary physical custody of [Mother], with [Father] enjoying reasonable access[.]

Father's access/visitation schedule remained as it was in the August 18, 2017 order.

7

When his May 30, 2017 motion to reconsider was denied, Father filed this timely appeal. We shall include additional details in our discussion.

## DISCUSSION

### *Standard of Review*

Maryland appellate courts employ three methods of review in child custody cases:

> When the appellate court scrutinizes factual findings, the clearly erroneous standard of [current Rule 8-131(c)] applies. If it appears that the chancellor erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion.

*Wagner v. Wagner*, 109 Md. App. 1, 39-40 (1996) (quoting *Davis v. Davis*, 280 Md. 119, 125-26 (1977)). An abuse of discretion arises when "no reasonable person would take the view adopted by the [trial] court," "when the court acts without reference to any guiding rules or principles," "when the court's ruling is clearly against the logic and effect of facts and inferences before the court," "when the ruling is violative of fact and logic," or when "its decision is well removed from any center mark imagined by the reviewing court." *Santo v. Santo*, 448 Md. 620, 625-26 (2016) (cleaned up). The standard accounts for the trial court's "opportunity to observe the demeanor and the credibility of the parties and the witnesses." *Petrini v. Petrini*, 336 Md. 453, 470 (1994). We will not reverse simply because we would not have made the same ruling. *North v. North*, 102 Md. App. 1, 14 (1994).

8

*Analysis*

As explained in our prior opinion, the circuit court's analysis of a requested modification of legal and physical custody follows a two-step process. *Jose*, slip op. at 17-18; *accord In re Deontay J.*, 408 Md. 152, 165-66 (2009). First, the circuit court determines whether there has been a material change in circumstance. *Wagner*, 109 Md. App. at 39. Second, if the court determines there has been a material change in circumstance, then it proceeds to consider the best interests of the child, evaluating guiding factors laid out in *Montgomery County Dep't of Soc. Servs. v. Sanders*, 38 Md. App. 406 (1977) and *Taylor v. Taylor*, 306 Md. 290 (1986).

*Sanders* provided ten non-exclusive factors:

1.   Fitness of the parents;
2.   Character and reputation of the parties;
3.   Desire of the natural parents and agreements between the parties;
4.   Potentiality of maintaining natural family relations;
5.   Preference of the child;
6.   Material opportunities affecting the future life of the child;
7.   Age, health and sex of the child;
8.   Residences of parents and opportunity for visitation;
9.   Length of separation from the natural parents;
10.   Prior voluntary abandonment or surrender.

38 Md. App. at 420 (citations omitted).

*Taylor* provided thirteen factors, some of which overlap the *Sanders* factors:

1.   Capacity of the Parents to Communicate and to Reach Shared Decisions Affecting the Child's Welfare;
2.   Willingness of Parents to Share Custody;
3.   Fitness of Parents;
4.   Relationship Established Between the Child and Each Parent;
5.   Preference of the Child;
6.   Potential Disruption of Child's Social and School Life;
7.   Geographic Proximity of Parental Homes;

9

8. Demands of Parental Employment;
9. Age and Number of Children;
10. Sincerity of Parents' Request;
11. Financial Status of the Parents;
12. Impact on State or Federal Assistance;
13. Benefit to Parents.

306 Md. at 304-11.

When considering the *Sanders-Taylor* factors, the trial court should examine "the totality of the situation in the alternative environments" and avoid focusing on or weighing any single factor to the exclusion of all others. *Best v. Best*, 93 Md. App. 644, 656 (1992). The best interest standard is "*the* dispositive factor on which to base custody awards." *Wagner*, 109 Md. App. at 38 (emphasis in original). But, as the *Sanders* Court explained:

> Unfortunately, there is no litmus paper test that provides a quick and relatively easy answer to custody matters. Present methods for determining a child's best interest are time-consuming, involve a multitude of intangible factors that ofttimes are ambiguous. The best interest standard is an amorphous notion, varying with each individual case, and resulting in its being open to attack as little more than judicial prognostication. The fact finder is called upon to evaluate the child's life chances in each of the homes competing for custody and then to predict with whom the child will be better off in the future. At the bottom line, what is in the child's best interest equals the fact finder's best guess.

38 Md. App. at 419. In other words, the standard is clear, but applying it can be difficult.

### *Legal Custody*

Father contends that the circuit court abused its discretion by granting joint legal custody without eliminating Mother's tie-breaking authority. Mother contends that the court's findings, related to the original Agreement, the child's "greater bond" with

10

Mother, and Father's concession that communication difficulties "justify the imposition of a third-party tie-breaker," support its decision.

While the "capacity of the parents to communicate and to reach shared decisions affecting the child's welfare" is relevant to a shared physical custody analysis, it is especially important in determining whether joint legal custody is appropriate. *Taylor*, 306 Md. at 304. As the *Taylor* Court explained:

> When the evidence discloses severely embittered parents and a relationship marked by dispute, acrimony, and a failure of rational communication, there is nothing to be gained and much to be lost by conditioning the making of decisions affecting the child's welfare upon the mutual agreement of the parties. Even in the absence of bitterness or inability to communicate, if the evidence discloses the parents do not share parenting values, and each insists on adhering to irreconcilable theories of child-rearing, joint legal custody is not appropriate.

*Id.* at 305. Nevertheless, and even when there is evidence of poor parental communication, joint legal custody may still be appropriate, but in such situations courts often employ tie-breaking provisions. *See Santo*, 448 Md. at 643 (holding that it was not an abuse of discretion to award joint legal and physical custody with a tie-breaker even though parents do not communicate well).

The circuit court evaluated twelve of the *Sanders-Taylor* factors with regard to legal custody. It found seven to be neutral or non-applicable.[4] The other five favored joint legal custody. Of these five, the court found one factor (acceptability of joint legal

---

[4] Those findings were the (1) preference of the child, (2) potential disruption of the child's social and school life, (3) demands of parental employment, (4) age and number of children, (5) sincerity of parents' request, (6) financial status of parents, and (7) impact on state or federal assistance.

11

custody to the parents) indicated a need for some tie-breaking authority, and another factor (relationship between the child and each parent) favored Mother holding it.[5]

In regard to the amenability of the parents to share custody, the court found:

> The parties originally agreed to joint legal custody with tie-breaking authority vested in [Mother]. [Father] desires to remove such tie-breaking authority now that he has returned to Maryland, but concedes that the parties have sufficient difficulties in communicating so as to justify the imposition of a third-party tie-breaker.

The court concluded that, although its application of the factors "strongly" supports joint legal custody, "some tie-breaking authority" was appropriate "to resolve disputes." As to which parent should fill that role, the court found:

> The child enjoys a good relationship with both parents, but has a greater bond[6] with [Mother] due to the significantly greater time the child has been in [Mother's] primary custody. This factor mitigates[7] in favor of [Mother] for holding tie-breaking authority.

Father testified at the hearings that communication between him and Mother was "not great at this point" because "there are so many simple things that end up being an

---

[5] The other three were the (1) fitness of the parents, (2) proximity of the parental homes, and (3) benefit to the parents.

[6] As we explain in more detail in the discussion related to physical custody, we question whether the evidence supports a finding of "greater bond" with either parent, but we understand the court to be saying only that in the past the child has spent more time with Mother, and is weighing that in the tie-breaking analysis. In this context, we are persuaded that the finding is not clearly erroneous.

[7] In its analysis of the factors, the court, on several occasions, concludes that a factor "mitigates" in favor of Mother. Ordinarily, to mitigate would mean "to cause to become less harsh or hostile" or "to make less severe or painful." But sometimes, it is used as an intransitive verb followed by "against," "where militate might be expected." Webster's Collegiate Dictionary, Tenth Edition, at 744. "Militate" means "to have weight or effect." *Id.* at 736. We understand its use by the court to mean that it has weighed the factor in favor of Mother.

issue and an inability to come to some kind of consensus" and that "it's a lot more complicated than it needs to be." Examples included disagreements and confusion regarding Daughter's eye care treatment, acquiring a passport, and summer camp enrollment. Mother confirmed communication issues regarding Daughter's eye care and passport. And, she testified to disagreements over other issues, including Daughter's wardrobe in California, celebrating Christmas and holidays, a BB gun given to Daughter by a friend of Father, and an incident with a teacher at pre-school.

In short, we hold the findings of the court as they relate to the issue of legal custody not to be clearly erroneous and its ultimate conclusion not to be a clear abuse of discretion.

### *Physical Custody*

Father contends on appeal, as he did in the circuit court, that it is in the best interests of Daughter, under present circumstances, to be with each parent as much as possible, which, in his view, is on a near equal basis. According to Father, where both parents are interested and have been actively and continuously involved in the child's life, a "shared parenting" plan is in the best interests of the child.[8] Therefore, he claims that the circuit court erred in its application of the *Sanders-Taylor* factors when it

---

[8] "Shared physical custody" or "shared parenting" refers to those families where the children live with each parent at least 35% and typically closer to 50% of the time. *See* Md. Code Ann. (1989, 2012 Repl. Vol., 2017 Supp.), Family Law § 12-201(n). Father argues that studies have shown that shared parenting is linked to better outcomes for children of all ages across a wide range of emotional, behavioral, and health measures, so long as the parents are not unfit, unloving, or abusive, citing Linda Nielsen, *Shared Physical Custody: Does it Benefit Most Children?*, 28 J. AM. ACAD. MATRIM. LAW 79 (2015).

awarded primary physical custody to Mother and established the new access/visitation schedule.

Under long-existing Maryland law and the "cloak of constitutional protection," a non-custodial parent has a "reasonable" right to liberal visitation with his or her child. *See Myers v. Butler,* 10 Md. App. 315, 317 (1970); *Wolinski v. Browneller*, 115 Md. App. 285, 299 (1997) (discussing the Supreme Court's recognition of a parent's Fourteenth Amendment liberty interest in the realm of child rearing and family life).  This right is not absolute, *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("family itself is not beyond regulation in the public interest . . . nor rights of parenthood are beyond limitation"), but any limitations placed on visitation must be reasonable, as the best interests of the child take precedence.[9]  *Boswell v. Boswell*, 352 Md. 204, 219-220 (1998) (holding that restriction for father's partner to be absent during visitation was not reasonable without factual findings as to likely harm to children).

The court considered and expressly evaluated twelve of the *Sanders-Taylor* factors with regard to physical custody.  Of these, it found eight to be neutral or non-applicable.[10]

---

[9] In examining reasonableness, courts look to see if the child may be endangered by spending time with the parent.  *See, e.g.*, *Painter v. Painter*, 113 Md. App. 504 (1997) (upholding denial of father's visitation on the basis of severe emotional and physical abuse of former wife and children); *John O. v. Jane O.*, 90 Md. App. 406 (1992) (upholding denial of father's overnight visitation on the basis of sexual misconduct with his minor child).

[10] Those findings were the (1) character and reputation of the parties, (2) physical, spiritual and moral well-being of the child, (3) environment and surrounding in which the child will be raised, (4) preference of the child, (5) material opportunities affecting the future of the child, (6) age and health of the child, (7) residence of parents and opportunities for visitation, and (8) prior voluntary abandonment.

14

And, four favored Mother. The circuit court awarded primary physical custody to Mother because of her "caretaking of the child . . . from an early age, which resulted in a stronger bond, a consistent parenting style and a structure to the child's day-to-day living that should not be disturbed." Father argues that the circuit court's findings as to these four factors are not supported by the record. We will address each:

*Fitness of the parents*

> "Both parents are fit. Father has not participated as fully as Mother in the child's development due to his military obligations when in California. As such, this factor is slightly in favor of Mother."

Father argues that the record shows the opposite because Father had at least 120 overnights in prior years, including about 140 overnights in calendar year 2015, and he has been actively involved in matters related to Daughter's daycare, school decisions, and medical treatment in both California and Maryland.

The court's finding does not suggest that Father had not participated in Daughter's development. And, to the extent that time with a child may have some relevance to parental fitness, weighing that factor "slightly in favor of Mother" is not clearly erroneous. But, the ultimate issue before the court involved the here and now as presented by the change in circumstances. The court attributed Father's participation in Daughter's development "to his military obligation when in California," but he is no longer in the military and is living in Maryland in close proximity to Daughter, who has had extended periods of living with Father without incident.

*The adaptability of the custodian to the task*

> "Mother clearly adapted to the role of primary caretaker for the period she and the child were in Maryland with the Father in California, and ever since. Father had some periods of time with the child in his extended care, and no issues seemed to have arisen."

The circuit court listed this as a factor, but it does not correspond exactly to any single *Sanders-Taylor* factor. It, too, takes into consideration past performance, and seems to relate generally to both "fitness of the parents" and the "relationship between the child and each parent." *See Taylor*, 306 Md. at 308 ("The psychological and physical capabilities of both parents must be considered, although the determination may vary depending upon whether a parent is being evaluated for fitness for legal custody or for physical custody."). Because Mother had adequately played the role of primary caretaker for Daughter between ages two and seven, Mother is clearly adaptable to the task. But, at the same time, Daughter, during those same years, had lived for extended periods of time with Father with no serious issues arising that would reflect negatively on his adaptability to the task. Notably, the court did not expressly treat this factor in favor of Mother.

*Desire of the natural parents and agreements between the parties*

> "The prior agreement of the parties granted primary physical custody to mother, and that is a significant factor in her favor, as it is essentially the only arrangement the child has known. [Father] asserts that the prior agreement was due to his military assignment in California. The Court does not find that this was the exclusive reason; [Father] had significantly less inclination than [Mother] to perform basic child-rearing functions when the child was much younger. This factor mitigates strongly in favor of [Mother]."

The court gave "significant" weight to the prior Agreement without reference to any other agreements or access arrangements arrived at between the parties. Father testified that he had entered into the Agreement while he was stationed in California in a

16

deployable unit of the USMC and he did not know, at the time, he would be moving back to Maryland. Mother testified, however, that when they entered the Agreement, they knew Father would likely be discharged from the military around 2015. The pre-school schedule was structured to allow him a four-month block of time in care of Daughter in between deployment rotations. Prior agreements between the parties may be entitled to weight, *see Breault v. Breault*, 250 Md. 173, 180 (1968), but they should be considered in light of the circumstances when they were entered into along with the totality of the circumstances surrounding the requested modification.

Nor does the court's analysis reflect on any agreements involving physical custody that the parties themselves have been able to arrive at and implement. For example, during the litigation, the parties agreed to an interim schedule with alternating weekend visitation *and* a Wednesday dinner for Father. And, upon his return to Maryland, Father offered modifying his summer visitation so that Daughter could have spent more time with Mother during daytime and overnight visits in June and July. The mid-week dinners proposed by Mother and Mother's proposed summer schedule beginning one week after the last day of school and ending one week before school began[11] were summarily eliminated without explanation. We express no opinion as to what schedule would be in Daughter's best interest, except to say we ordinarily presume that parents have the best interests of their children and a court's unexplained rejection of an access proposal arrived at by the parents that was in place during the litigation is troubling.

---

[11] Father proposed a week-on, week-off schedule in the summer.

17

Moreover, the court found that Father had "significantly less inclination than [Mother] to perform basic child-rearing functions" when Daughter was younger, and that "mitigates strongly in favor of [Mother]." Not only is the relevance of that finding to either parent's desire unclear, but we do not find any evidence in the record for that determination or any evidence that would support an inference to that effect.

*Length of separation from the natural parents*

"Due to [Father's] military assignment in California . . . the parties agreed to primary physical custody in favor of [Mother], with periods of access by [Father]. The Court will not construe this as being a "separation" of the child from a natural parent, but rather an interruption to regular access. Such interruption came at a critical time in the development of the minor child and allowed a stronger bond to persist with [Mother]. This factor mitigates strongly in favor of [Mother]."

To be sure, the record shows that Father's military service and being stationed in California until mid-2015 impacted the terms of the Agreement and interrupted his regular access to Daughter. Because this "interruption came" when Daughter was between ages two and seven, the circuit court found that it came at a critical time in her development, and inferred or assumed that time equals bond and thus "a stronger bond to persist with [Mother]." It concluded that this "mitigates strongly in favor of [Mother]." Any factual basis for this inferential leap and how it relates to the visitation determination in this case is unclear.[12] The record reflects, and both parties agreed, that Daughter is

---

[12] In the context of family law, the term "bonding" is synonymous with "attachment," which involves the emotional connection between a parent and a child. *See In re Samone H.*, 385 Md. 282, 307-312 (2005) (discussing bonding studies extensively) (citing David E. Arredondo, M.D., and Hon. Leonard P. Edwards, *Attachment, Bonding, And Reciprocal Connectedness*, 2 J. Ctr. for Fam., Child. &

18

close to both parents and their respective households, and that, when she was in one parent's care, she missed the other parent. There is no evidence or testimony from anyone to the contrary.

In the end, the court based its physical custody conclusion on "caretaking" of Daughter "from an early age," "a consistent parenting style" and not disturbing "a structure to [Daughter's] day-to-day living," while acknowledging the benefit of "regular and consistent access by [Father]." But, in short, the circuit court's revised order does not, in our view, adequately explain its resolution of physical custody and particularly Father's access to Daughter. *See Viamonte v. Viamonte*, 131 Md. App. 151, 159 (2000); Md. Rule 2-522(a) ("In a contested court trial, the judge, before or at the time judgment is entered, shall prepare and file or dictate into the record a brief statement of the reasons for the decision . . . .").

For example, Mother's recommendation in her testimony, and as advanced by her counsel in the proceedings, was alternate weekends, a mid-week dinner, and all but two weeks in the summer for Father. The alternating weekends and the weekly dinners had been employed by agreement of the parties during the litigation without any evidence of a meaningful disruption to Daughter's schedule and routine. And, we are especially perplexed by the court's determination to limit Father's summer visitation to two weeks. The pre-school and school schedules under the Agreement provided for extended stays with Father, and they had occurred in the past without incident.

---

CTS. 109, 114 (2000)). Of course, expert testimony or a bonding study is not necessarily required for a judge to make a finding of fact on "bonding."

19

The record reflects two intelligent and caring parents, who both want the best for Daughter and both of whom were optimistic that their communication difficulties will improve once litigation concluded. Hopefully, that will be the case.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AS TO LEGAL CUSTODY AFFIRMED.**
**JUDGMENT AS TO PHYSICAL CUSTODY IS VACATED AND THE CASE IS REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**
**COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**